LEO T. ROCKENSTEIN v. JOSEPH ROGERS, Appellant.—31 S. W. (2d) 792.

Division One, October 14, 1930.

*Wayne Ely* for appellant.

*Mark D. Eagleton, John F. Clancy, James A. Waechter* and *Hensley, Allen & Marsalek* for respondent.

472

SEDDON, C.—Plaintiff (respondent here) commenced this action against defendant (appellant here), in the Circuit Court of the City of St. Louis, to recover damages for personal injuries alleged to have resulted from defendant's negligence in the operation of an automobile along and over a public street and highway in St. Louis County. A trial of the action to a jury resulted in a unanimous verdict for plaintiff in the sum of $10,000. After an unavailing motion for a new trial, defendant was allowed an appeal to this court from the judgment entered upon the verdict.

The petition charges that "on or about November 11, 1925, plaintiff was in and upon an open and public sidewalk on the west side of Belleview Avenue, between Clayton Road and Wise Avenue, all open and public streets and highways in St. Louis County, Missouri, and plaintiff was alongside an automobile which was then and there parked and standing still at the west curb of Belleview Avenue at the aforesaid place, and that said automobile had been so stopped there and standing still as aforesaid for some time theretofore, to-wit, several minutes, and that said automobile was plainly open and

visible to all persons passing thereabout, and that defendant then and there drove and operated an automobile southwardly over and along Belleview Avenue there, and negligently caused and permitted said automobile to violently and forcibly collide with and strike the aforesaid automobile parked and standing still as aforesaid, directly thereby causing said automobile which was parked there as aforesaid to go upon said sidewalk there, and to violently and forcibly collide with and strike plaintiff, and plaintiff was directly thereby caused to sustain'' certain bodily injuries as specifically described in the petition. The petition prays damages, general and special, in the aggregate sum of $15,000.

The answer is a general denial, and a plea of contributory negligence, on the part of plaintiff, in the following particulars:

''Further answering, defendant states that the plaintiff's injuries, if any, were the result of his own negligence directly contributing thereto in that the plaintiff failed to equip his automobile with lighted lamps as required by law.

''And defendant further states that plaintiff was negligent in that he voluntarily assumed a position of imminent danger when there was at hand and accessible to him a place of safety, and that such negligence on the part of plaintiff directly contributed to his injuries, if any.

''Defendant further states that plaintiff's injuries, if any, were the direct and proximate result of his negligence in occupying himself with filling the gasoline tank of his automobile in the dark and without having said automobile properly equipped with lights as required by law, and thereby making it impossible for the defendant to see the plaintiff or his automobile under the conditions obtaining at the time.

''Defendant further states that plaintiff's injuries, if any, were the result of his negligence in occupying himself with pouring gasoline into the tank of his automobile and in not looking out for automobiles and other vehicular traffic approaching him, although the plaintiff knew, or by the exercise of ordinary care would have known, that his said automobile was in a position of imminent peril of being struck, and that by reason thereof the plaintiff was in a position of imminent peril of being struck by other automobiles, and that such negligence on the part of plaintiff was the direct and proximate cause of the injuries, if any, received by him.''

The reply is a general denial of the averments of the answer.

The substantive facts bearing upon the collision, as shown by the record, are practically undisputed; that is to say, defendant, by his own testimony, admits that a collision occurred about five o'clock on the afternoon of November 11, 1925, between defendant's automobile and plaintiff's automobile. Plaintiff, a journeyman carpenter,

had been engaged in working upon an apartment building, in process of construction in the city of St. Louis. Plaintiff resided in Richmond Heights, a suburb of the city of St. Louis, situate in St. Louis County. He owned and used a Ford touring automobile in traveling back and forth between his home and his place of work. He stopped work at 4:30 o'clock on the afternoon in question, and while plaintiff was traveling southwardly toward his home along Belleview Avenue, an open and much traveled highway in St. Louis County, at a point between Ethel and Hoover avenues, the gasoline supply in plaintiff's automobile became exhausted. Plaintiff parked his Ford automobile at the west curb of Belleview Avenue, and he walked north about a block to a garage, where he obtained a five-gallon can of gasoline, with which he returned to his parked automobile. The gasoline tank of plaintiff's automobile was located beneath the cushion of the front seat of the automobile, and the cap, or tap, of the gasoline tank was on the right, or west, side of the automobile tank. Standing upon the sidewalk on the west side of Belleview Avenue, adjacent to the west curb, plaintiff removed the cushion of the front seat of the automobile, unscrewed the cap of the gasoline tank, and was in the act of pouring the contents of the five-gallon gasoline can into the orifice, or opening, of the gasoline tank, when defendant's automobile violently collided with the hub cap of the left rear wheel of plaintiff's parked automobile, which was standing stationary, adjacent to, and against, the west curb of Belleview Avenue. The force of the impact of the collision was of sufficient violence to move the front wheels of plaintiff's automobile forward and over the top of the curb and upon the sidewalk where plaintiff was standing. According to plaintiff's evidence, the west curb of Belleview Avenue, at the point of collision, was seven and one-half inches high, and according to defendant's evidence, the curb was five and one-half inches high. The width of the vehicular roadway of Belleview Avenue, between the curblines, was approximately thirty-seven feet, eight inches. Adjacent to the west curb of Belleview Avenue is a cinder sidewalk, approximately six or seven feet wide, and west of the sidewalk was a deep gully or ditch, which was used as a dumping place for tin cans, scraps of iron, and other rubbish. Plaintiff testified that the violence of the collision was of sufficient force to throw him across the cinder sidewalk and into the deep gully, or hole, adjacent to the sidewalk, where he fell upon his back. Plaintiff testified positively that the emergency brake was set upon his automobile, and that lamps upon his automobile were lighted at the time of the collision, and that, while the collision occurred about sundown on a cloudy afternoon, it was still sufficiently light to permit objects to be easily seen and observed for a distance of two or three city blocks. Both automobiles bore evidence of the violence of the collision, the rear springs of plaintiff's

automobile being forced under the body of the automobile, the brake rods were buckled, the radius rods were bent double and into a V-shape, and the left fenders of the automobile were mashed in against the side of the automobile.

Plaintiff testified respecting the occurrence:

"I took the five-gallon can and set it upon the top of the (automobile) tank; I had my feet on the sidewalk, and I just leaned my chest against the side of the car and took the can and was tipping it up easy so it would run into this little hole in the gasoline tank. The next thing I knew I was—the car was hit, and I was knocked backwards into a deep hole there; I expect twelve to fifteen feet deep, on the other side of the sidewalk. The car was knocked up, the front wheels knocked onto the sidewalk, and I was knocked backwards down into this ditch, and I went all the way to the bottom."

Defendant, by his testimony, thus accounted for the collision: "As I approached the point where his (plaintiff's) car was parked, and where the collision occurred, there were three machines coming from the south headed north, that is, coming at my left and towards me. Two of these machines were very close together, approximately ten, maybe fifteen, feet apart; and the third machine, when I first noticed it, was about at Wise Avenue, which is about a block and a half away, and it seemed to be coming at a high rate of speed, I estimated around thirty-five miles an hour; and he came up rapidly behind these two cars, overtaking them, and attempted to pass them both; and as he was attempting to pass the second car, that car swerved out a little bit, which made the car that was passing turn a little farther to the west, and he swung clear over into my path and was coming directly towards me, couldn't have been more than five or six feet away. I was just about at the front end of the second car when he turned out; I should judge something around fifteen feet or so. Well, in order to avoid a head-on collision, I swerved to the right, and in doing so, I struck the left rear wheel of the (plaintiff's) parked automobile there. I thought it was just a parked machine. I didn't realize anyone was in it. I drove ahead sixty or seventy-five feet, maybe a little further, close to the corner of Hoover Avenue. I parked my car and came back to see what damage I had done to the car; and it was then that I first observed the plaintiff crawling out of the car. He was—he appeared to me as if he was just getting out of his car. He had a large five-gallon oil can, and it had evidently been knocked out of his hand, and it was lying on the front seat, with gasoline spattered all over. Well, I asked him if he was hurt; I told him I was the one who hit his machine, and he didn't seem to know who hit him or what happened. I told him I didn't realize anyone was in the machine; that I thought it was just a parked ma-

chine there, because the machine was dark; and I asked him why he didn't have his lights on, and he said it was dangerous to have lights on when he was pouring gasoline in his car, and that they always made him turn them off at the oil stations when they were filling the tank, so he wasn't going to take any chances.''

Cross-examination: ''Q. Now, as you came off Clayton Road and went into Belleview Avenue going south, you say you had your lights on? A. I did. Q. How far would your lights throw their rays forward in order for you to discern objects? A. Approximately 250 feet. Q. And you were at a point about eight feet east of the west curb, going south? A. Yes, sir. Q. Now, tell this jury why in the world you couldn't have seen this (plaintiff's) automobile before you got, as you say, within four or five feet from it? A. Well, I didn't observe it at all; coming up in back of it that way, it wasn't directly in line of my lights until I turned to the right to avoid this other machine. Q. And had you been looking you could have seen it, couldn't you? A. Well, I think I was looking ahead. Of course, I never expected to encounter a parked automobile out there, especially without any lights on it; that is prairie out there, and I think that is the first time I ever saw a machine parked there. . . . Q. He was parked immediately on the west side of the road? A. Yes, sir. Q. And he was right up against the curb; no question about that? A. That is right. Q. And stopped (stationary)? A. Yes, sir. Q. Then I want you to tell this jury, if your lights throw rays sufficient to discern objects 250 feet ahead of you, how it happened that you didn't see that automobile? A. I did not observe it at the time; in fact, if I had it wouldn't have made any difference; I would have had to hit it anyway, under the circumstances. Q. You were determined to go into it anyway? A. I wasn't determined to hit it; there wasn't anything else for me to do under the circumstances. Q. Lights or no lights? A. That is true. Q. So, then, whether his (plaintiff's) machine had the lights turned on or not, it made no difference with you at that time? A. It wouldn't have made any difference under the circumstances; no, I couldn't avoid it. Q. And after you hit the rear left wheel of that automobile, you knocked it up onto the curb, didn't you? A. I did. Q. And you kept going; you didn't come to a stop for fifty or sixty feet, did you? A. That is true. . . . Q. And your crashing into this car caused it, even with the brakes applied, to go on up over the curb? A. Yes, sir; I was interested in avoiding a head-on collision with this other machine, and I was so close behind this parked machine, when this other car turned out directly in front of me, that there was no other alternative; it was a matter of inches, and I tried to avoid striking this car. I got over just as far as I possibly could where I thought I would still avoid hitting this

machine, but it was a matter of inches, and I didn't have sufficient room. After I hit it, I went on and drew up to the curb as fast as I possibly could under the circumstances, and parked. Q. But the fact is, you didn't stop for sixty or seventy-five feet? A. That is true; yes, sir. Q. And the fact is that the other automobile didn't hit you? A That is true. Q. And none of these other machines hit you? A No." Defendant fixed the speed of his automobile, at the time of the collision, at approximately twenty miles per hour.

Notwithstanding the damaged condition of his automobile, plaintiff drove the automobile to his home. Upon arriving at his home, plaintiff testified that he experienced considerable pain in the region of the small of the back, and his wife applied a liniment and hot towels to his back. Plaintiff was unable to sleep during the night, and he went to St. Mary's Hospital on the next day, where he met Dr. Fitzgerald, who examined him and advised that plaintiff remain in the hospital for further treatment. However, plaintiff returned to his home, but on the following day, upon the insistence of Dr. Fitzgerald, plaintiff returned to the hospital, where he remained in bed continuously for sixteen days, under the treatment of Dr. Fitzgerald. He then returned to his home, and thereafter received treatments from Dr. Fitzgerald once or twice each week until the time of the trial of this action, which occurred about one year and two months after the day of plaintiff's injuries. According to plaintiff's testimony, his chest and abdomen became swollen shortly after the casualty occurred. He testified that he felt as though he had a deep cold on the chest, and experienced pain and difficulty in breathing. This condition continued for about one week, and then cleared up. He also suffered a cut on the left knee, which healed after a time. The principal injury suffered by plaintiff was a strain or wrench of the back, in the region of the sacroiliac joint, or pubic bones. From the time of his injury until the time of the trial, plaintiff complained of severe pains in the lower part of his back. He testified that he had not previously suffered pains in the back, and had continuously worked at his trade of carpenter without inconvenience or loss of time. Upon being discharged from the hospital, Dr. Fitzgerald prescribed a brace or corset to be used by plaintiff, as a support, which brace plaintiff was wearing at the time of the trial. Describing the condition of his back at the trial, plaintiff testified: "As long as I keep moving, keep walking, I feel better, but if I stand awhile, or sit down, why it just keeps throbbing, just hurting all the time, and in the morning when I get up I am usually very stiff. I usually roll out, and just gradually work myself around. It usually takes about two hours after I put this brace on before I am able to feel anywhere near comfortable at all. It seems like the brace causes friction; it rubs my back like,

and after it is on there about two hours it relieves me; it limbers me up to a great extent.''

Dr. Fitzgerald thus described the nature and extent of plaintiff's injuries: ''The first time I saw Mr. Rockenstein, he was complaining of severe pain in his back and chest, and pain all through his abdomen. The abdominal muscles were rigid, there were abrasions over his abdomen and abrasions over his chest. In the back there was a tenderness manifested over about the third and fourth lumbar vertebrae and down into the sacroiliac region, which was more pronounced on the right side, although there was some tenderness in both the left and right regions. He also had pain in the region of the left kidney, and there were abrasions. I found an abrasion on the medial surface of the left knee, and pain and tenderness; he flinched on any motion of the left knee, although he was able to stand on it, but with some difficulty. . . . For the first few days I saw him twice a day, and after that I saw him once a day while he was in the hospital. After he went home, I saw him at his home and at my office, and of late I have been seeing him every seven to ten days at my office. He is still under my care, and I saw him last Monday at my office. I then examined his back and sacroiliac joint. There seems to be a certain limitation of motion in the joints; that is, he hasn't free movement; he couldn't stand up and bend completely forward and down without pain and flinching, and there seems to be a roughening of the surface of the joints because of this injury. . . . The injury to the sacroiliac joint and the third and fourth lumbar vertebrae would, in my opinion, cause excruciating pain at times, and I found evidence of injury to those parts as late as Monday a week ago. No time since Mr. Rockenstein has been under my care has he been absolutely free from pain, although I used sedatives of various kinds to try to relieve him. I have even used opiates. In my opinion, the injuries that he received will probably last the rest of his life; there will be some soreness, and he will be subject to changes in the weather, and there will be pain, off and on there, for the rest of his life. In my opinion, once there is an injury to those ligaments, there will be permanency. In my opinion, the plaintiff will not be without pain unless he continues to wear a brace.''

Dr. Pernoud, who made an examination of plaintiff on January 2, 1927, immediately before the trial of the present action, testified: ''I had this gentleman strip off, and in so doing I found that he was at that time wearing a spring belt, or corset-like arrangement, for the support of the lower part of the spine, and the sacroiliac joints; that he complained of pain and tenderness, on pressure, over the lower lumbar spine and both sacroiliac joints; that his lumbar spine does not arch at all when he bends over, but remains perfectly stiff and rigid. The large muscles, which we call the erector

spine muscles, and which are also commonly known as the loin muscles, the large muscles on each side of the spine, were extremely tense; that is, they were in a state of marked contraction. He complained of various pains in the back and hips, and extreme tenderness on pressure over the right sacroiliac joint. It was my judgment that he had an arthritis involving the lower part of the lumbar spine and both sacroiliac joints. I mean that, from my judgment, clinically, I was able from the history of the case, and the facts I was to learn about it, that there was an inflammatory process about these lower spinal joints and in the sacroiliac joints. There was rigidity; there was no movement at all in the lower lumbar spine. There was some limitation of forward movement in his body. He was able to bend over, but apparently with some pain. I don't think he could touch the floor with the fingers of his hands. It was my estimate that he couldn't reach any closer than about eight or ten inches from the floor; that was my judgment. There is evidence that, at some time or other, his spine had suffered some sort of traumatism. Q. Doctor, in your opinion, can injuries such as you found the plaintiff suffering from have been caused by trauma? A. They could be. Q. And by trauma you mean what, doctor? A. By trauma I mean injury or bruising by violence. Q. Doctor, assuming that, on November 11, 1925, the plaintiff sustained injuries, and your examination was made January 2, 1927, will you tell the jury whether or not in your opinion those (injuries) that you found are permanent or otherwise? A. I would say that they are permanent as I have described them.''

Dr. Barnes, a neurologist, examined the plaintiff while he was in the hospital, and thus testified respecting his examination of plaintiff: ''There was rigidity—down in the lower part of the abdomen the muscles were rigid, and there was pain about the lower part of the back, the small of the back, from the second lumbar spine downward. The patient could not move, he told us, and, because of the excessive pain this created, he didn't move, and wasn't asked to very much. There was at that time a slight temperature. The reflexes at the knees were exaggerated, deeply so, on the two sides, and it was my opinion that there was no disease or injury to the brain or spinal cord. That was the extent of my examination, and it was my opinion that the pain he was suffering in those regions was due to a bruising, or what is popularly called back strain.''

On December 31, 1926, Dr. Peden, an X-ray specialist, took several X-ray pictures of plaintiff's back and sacroiliac joint. The physician interpreted the X-ray pictures as disclosing ''a cloudiness and infiltration; that is, a growing in of new bone, especially in the lower half of the right sacroiliac joint; it means that there is a filling in of the normal joint space with new bone.'' Another X-ray picture taken by Dr. Peden was interpreted by him as disclosing ''a roughen-

ing, that is, small projections of new bone on the third and fourth lumbar vertebrae, especially on the left side; that is called exostosis, or lipping of the projections of the vertebrae." Dr. Peden diagnosed plaintiff's condition as "spondylitis," or an inflammation of the joints of the spine. Asked if a condition, or injury, such as indicated by the X-ray pictures, could be caused by trauma, Dr. Peden answered, "I think that trauma would have a very important part in it; yes, sir."

It was the opinion of plaintiff's medical witnesses that his injuries are permanent in character.

Defendant proffered two medical witnesses, who testified that they had made an objective examination of plaintiff, and that they were unable to find any indications or evidence of permanent injury, although plaintiff complained somewhat of pain in the course of their examination. Defendant's medical witnesses diagnosed plaintiff's condition as an arthritis, resulting solely from an infection, and not from traumatism.

Plaintiff testified that he was thirty-three years of age at the time of his injury, before which time he had been continuously employed as a journeyman carpenter, earning an average wage of $66 per week. Since his injury, and during the year 1926, plaintiff testified he had been able to perform some light duties, including the superintendence of a building construction job, and that he had earned approximately $700 at such light employment. He testified that he was physically unable to resume his former trade as a journeyman carpenter. Evidence was adduced by plaintiff that his expenditures for hospital care and attention amounted to approximately $100, and that the charges rendered by his three physicians aggregated $275, which charges plaintiff deemed to be reasonable.

The foregoing is a general outline of the substantive evidence. Certain incidents occurring in the course of the trial, and the rulings of the trial court thereon, which are assigned as reversible error by the appellant, will be recited and discussed in the course of our opinion.

I. Appellant assigns error in the trial court's refusal to sustain a demurrer to the evidence, as requested by defendant at the close of plaintiff's case in chief, and again at the close of all the evidence. It is urged by appellant that, viewing the evidence in the light most favorable to plaintiff, there is no substantial proof of any negligent act or omission on the part of defendant, and that the evidence discloses that the collision of defendant's automobile with the parked and stationary automobile owned by plaintiff was an unavoidable occurrence, bespeaking no negligence on the part of defendant.

We are of the opinion that the evidence is amply sufficient to establish a prima-facie case of culpable negligence on the part of defendant. The moving automobile which collided with plaintiff's parked and stationary automobile was under the personal control and management of defendant, and the collision was such as does not happen in the ordinary course of events in the exercise of due, or ordinary, care. As aptly stated by GOODE, J., in Fleishman v. Ice & Fuel Co., 148 Mo. App. 117, 125: "If the instrumentality which did the damage was under the management of a person, and the accident was such as does not happen in the ordinary course of events if the instrumentality which caused it is handled with due care, the inference of negligence may be drawn from the testimony. [Dougherty v. Railroad, 81 Mo. 325; Shuler v. Railroad, 87 Mo. App. 623; 2 Cooley, Torts (4 Ed.) 1424.]" Under an almost identical state of facts, it has been ruled in this jurisdiction that evidence that the driver of an automobile, while traveling along an open and public street, permits it to strike another automobile which is standing stationary in a place of safety, contiguous to the curb of the street, is sufficient to make out a prima-facie case of negligence on the part of the driver of the moving automobile. [Schrader v. Burkel (Mo. Sup.), 260 S. W. 63, 64; Reese v. Holekamp (Mo. App.), 260 S. W. 762, 763.] While the defendant testified to facts which (if believed by the jury) might tend to exculpate him from the inference of negligence in driving his automobile against the plaintiff's parked and stationary automobile, nevertheless the question of defendant's negligence was one for the determination of the jury. [Schrader v. Burkel, supra; Fleishman v. Ice & Fuel Co., supra; Reese v. Holekamp, supra; Gannon v. Gas Light Co., 145 Mo. 502, 516; Bond v. Railway Co., 315 Mo. 987, 1002.] Furthermore, the jury were not obliged to accept and believe the defendant's explanation of the cause of the collision. It is the unquestionable province of the jury to believe all of the testimony of any witness, or none of it, or to accept part of the witness's testimony and to reject, as untrue, the remaining part of his testimony, as the jury find the same to be true or false, when viewed and considered in relation to the other testimony and the facts and circumstances in the case. [Anderson v. Davis, 314 Mo. 515, 556; Gould v. Railroad Co., 315 Mo. 713, 723, and cases there cited.] Nor do we think that plaintiff must be held guilty of contributory negligence as a matter of law. His positive testimony was to the effect that the lamps of his parked automobile had been, and were, lighted at the time of the collision, and that there was sufficient natural light to permit objects to be seen and observed for a distance of two or three city blocks. Defendant, by his own testimony, concedes that plaintiff's automobile was standing stationary immediately adjacent to the west curb of Belleview Avenue. According to plaintiff's testimony, he

was standing upon the west sidewalk of Belleview Avenue, a place where he had the unquestionable right to be, at the time of the collision. Whether plaintiff was contributorily negligent was a matter exclusively for the determination of the jury. The trial court rightly refused defendant's requested demurrers to the evidence, and appellant's assignment of error must be denied.

II. Error is assigned in the giving and refusal of certain instructions. It is insisted by appellant that plaintiff's principal instruction, numbered 1, is erroneous because the instruction directed a verdict for plaintiff if the jury should find and believe, in addition to the hypothesized facts, that "plaintiff was exercising ordinary care for his own safety." Appellant argues that, although plaintiff's automobile was standing stationary immediately adjacent to the west curb of Belleview Avenue, and although plaintiff was standing upon the sidewalk pouring gasoline from a five-gallon can into the tank of the stationary automobile, yet the automobile was *in operation*, within the purview and meaning of the Motor Vehicle Act of our State, which act provides that "every person *operating* a motor vehicle on the highways of this State shall drive the same in a careful and prudent manner, and shall exercise the *highest* degree of care." [Laws 1921, 1st Ex. Sess., sec. 19, p. 91.] Hence, appellant argues that plaintiff's Instruction No. 1 clearly and positively advised the jury that plaintiff was required to exercise only *ordinary* care for his own safety, whereas the Motor Vehicle Act, supra, required him to exercise the *highest* degree of care for his own safety, as well as for the safety of other persons. Appellant has cited a number of juristic authorities, mostly from foreign jurisdictions, to the effect that a stationary and standing automobile may be "in operation," within the purview and meaning of statutes similar to that of our own State. We do not find any decision of our own court which so construes Section 19 of our Motor Vehicle Act, in the light of facts which are similar to those in evidence in the present case. But assuming, *arguendo* (without so ruling in the present case), that the facts and circumstances in evidence bring the instant case within the construction given to similar statutes by the appellate courts of other and foreign jurisdictions, so as to require the exercise of the highest degree of care upon the part of a person who leaves his automobile standing stationary within the limits of a public highway, nevertheless we are of opinion that appellant is in no position to complain of error in the giving of plaintiff's Instruction No. 1; this, for the obvious reason that appellant invited the error (if any there be) in the plaintiff's instruction. The defendant (appellant), by his amended answer in the instant cause, charged con-

tributory negligence on plaintiff's part in several respects, and in the course of such allegations charged that plaintiff, while pouring gasoline into the tank of his automobile, knew, or "by the exercise of *ordinary* care would have known, that his said automobile was in a position of imminent peril of being struck by other automobiles." Thus, defendant, by his own pleading in the cause, laid upon plaintiff the duty to exercise merely "ordinary care," rather than the duty to exercise the "highest degree of care." The defendant having adopted the theory that plaintiff was chargeable with the exercise of only ordinary care for his own safety, he will not be permitted to charge the trial court with error in following the very theory presented by his own answer and pleading. Furthermore, the defendant's requested instructions, or some of them, as set forth in the record, were predicated upon the theory that the jury should find that "the plaintiff did not directly contribute to the said accident by negligence, or by want of prudence or *ordinary* care on his part." Having proceeded upon such theory in the trial of the cause, defendant will not be permitted to change his position and theory upon appeal to this court. [Mirrielees v. Railroad Co., 163 Mo. 470, 486, and numerous cases there cited; Plannett v. McFall (Mo. App.), 284 S. W. 850. 853.]

Appellant complains of the refusal of his requested Instruction E, which reads: "The court instructs the jury that if you find and believe from the evidence that one of plaintiff's purposes in joining Carpenter's Union, Local No. 185, was to receive the benefits provided by said union for its members, and if you further find and believe from the evidence that one of the benefits of said union was the provision of funds for its disabled members, then you are instructed that if you find that plaintiff did not apply for said disability benefits you may take that fact into consideration in making up your verdict."

During the cross-examination of plaintiff, defendant's counsel sought to elicit the fact that plaintiff was a member of a trade union at the time of his injury, and that plaintiff had made no claim to the union for disability benefits. In answering such line of inquiry, plaintiff testified that, in April, 1926, he had made a claim to the secretary of the local union for disability benefits, but that the secretary of the local union told plaintiff that his claim for disability benefits was made too late, and was useless, and that the rules or by-laws of the union required such a claim to be made within sixty days after the claimant's injury. The defendant's requested instruction wholly ignored the plaintiff's explanation, elicited on cross-examination, respecting why he had not pressed his claim for disability benefits, but the instruction would have baldly told the jury, in effect, that, if plaintiff (for *any* reason) did not apply to the union for disability benefits, the jury might take that fact into

consideration in reaching a verdict. To say the least, the requested instruction was argumentative in form and language, and no reversible error was committed by the trial court in the refusal thereof. [38 Cyc. 1600; Riley-Wilson Grocer Co. v. Canning Co., 129 Mo. App. 325, 336; Johnson v. Railroad Co., 117 Mo. App. 308, 311.]

Appellant complains of the refusal of his requested Instruction F, which would have told the jury that, if they should find and believe from the evidence "that plaintiff is now engaged in business as a contractor, and that he is able to pursue his duties as such contractor and is able to secure a sufficient number of jobs as such contractor to furnish him with fairly regular employment, then even though you find from the evidence that plaintiff is not earning $12 a day (the wage plaintiff had previously earned as a journeyman carpenter) as such contractor, if you find he is a contractor, you should not determine from that fact that plaintiff's earning capacity has been decreased by reason of the injuries, if any, received by plaintiff in the accident complained of." We think that the requested instruction prescribed a false and inaccurate measure of plaintiff's damages, and hence the instruction was rightly refused by the trial court. Certainly, plaintiff is not to be deprived of his right to recover for diminution of earning capacity merely because he was physically and mentally able, notwithstanding his injuries, to pursue a less lucrative vocation or business.

Error is assigned in the refusal of another of defendant's requested instructions, but, inasmuch as appellant does not point out any reversible error in the refusal of the instruction, the assignment will be treated as abandoned.

III. Appellant assigns error in the admission of certain testimony, and in the refusal of the trial court to discharge the jury because of certain incidents in the course of the trial.

Defendant's counsel, on cross-examination of plaintiff's witness, Dr. Fitzgerald, interrogated the witness at some length respecting a written report made by the witness of his examination of the plaintiff, the written report being dated November 30, 1925. On redirect-examination, the witness was asked by plaintiff's counsel, "Whom did you send this report to, that he has been interrogating you about?" The witness answered, "I think that was sent to an insurance company." After the witness had thus answered the question, defendant's counsel objected to the question and the answer as improper, and moved that the jury be discharged. The trial court overruled the objection and refused to discharge the jury, and error is assigned in such ruling. We find no error therein.

The applicable rule is thus clearly stated in 40 Cyc. 2527: "It is proper, on redirect examination, to bring out the details of a transaction or occurrence elicited from the witness on cross-examination, or the circumstances surrounding an occurrence, or the making of a statement so brought out." Furthermore, the objection to the question and answer came too late, that is, after the witness had answered the question. A party will not be permitted to withhold his objection until he learns whether the answer is favorable or unfavorable, and then object if the answer is not to his liking. [Boulicault v. Glass Co., 283 Mo. 237, 247, and cases there cited.]

Plaintiff, on direct examination, was asked to relate to the jury the conversation had between plaintiff and defendant immediately following the collision. Plaintiff answered, in substance, that defendant expressed regret and sympathy that plaintiff had been hurt, and that defendant wrote the name of a casualty insurance company upon a card, which defendant handed to plaintiff, saying, "Now, there is my insurance company." Upon objection of defendant's counsel, the trial court struck out the plaintiff's testimony, respecting what was written upon the card, and respecting what was said by defendant upon handing the card to plaintiff, and directed the jury to disregard the same, but the trial court refused defendant's request to discharge the jury. We believe that it was a matter well within the sound discretion of the trial court whether to discharge the jury, after having admonished the jury to disregard the alleged objectionable testimony. [Busch v. Railroad Co. (Mo. Sup.), 17 S. W. (2d) 337, 340.] The connection of an insurance company with the defense of the cause had already appeared in the testimony of an earlier witness, and we perceive no reversible error in the refusal of the trial court to discharge the jury because of the later testimony, which the court specifically admonished the jury to disregard. [Lewis v. Packing Co. (Mo. Sup.), 3 S. W. (2d) 244, 250.]

Plaintiff, upon being asked to relate what was said by defendant immediately after the collision, answered: "When I told Mr. Rogers (defendant) that my back was hurt, he said, 'Well, you had better go and get a doctor and have some attention;' he says, 'I had my back hurt some time ago,' and he says, 'I thought it was well, but I ain't over it yet.' He says, 'I feel it every once in a while now.'" Upon motion of defendant, the trial court struck out the answer made by plaintiff to the question, and the jury were directed to disregard the same. Defendant requested no further action by the trial court respecting the matter, and saved no exception to the method of the court in disposing of the matter. Upon the record before us, there is no question here

for review. [Shanahan v. St. Louis (Mo. Sup.), 212 S. W. 851, 852, and cases there cited.]

At the close of plaintiff's evidence-in-chief, plaintiff offered in evidence the original answer filed by defendant in the cause. Upon being asked the purpose of introducing the original answer in evidence, plaintiff's counsel replied, "To show the change in your defense and the change in lawyers." Thereupon defendant's counsel objected to the introduction of the original answer in evidence, upon the ground of immateriality, which objection was overruled by the trial court. Error is assigned in such action of the trial court. As a general rule, it is proper for the trial court to admit an abandoned pleading in evidence, for the purpose of showing the admissions therein contained. [Lynch v. Railway Co., 208 Mo. 1, 19, and cases there cited.] The appellant's abstract of the record, filed herein, omits and fails to show the subject-matter, or content, of defendant's original and abandoned answer. Consequently, this court is not advised as to what admissions are made by defendant therein. Upon the record before us, we are in no position to review the propriety of the action of the trial court, or can we rule that the trial court erred in the matter assigned.

Appellant claims that the trial court erred in permitting plaintiff's witness, Dr. Peden, to answer the following question: "Doctor, assuming that the original X-ray pictures taken a day or two immediately following the (plaintiff's) injury were negative, would that indicate that there was no evidence of disease to the bones in those parts, no previous disease to the bones; would the original X-ray, if negative, indicate that?" Doctor Peden answered: "I would conclude if the X-ray examination you refer to was negative, that there was no evidence of previous bone disease." Dr. Fitzgerald, another of plaintiff's witnesses, had previously testified, on cross-examination by defendant: "During the time he (plaintiff) was in the hospital, I had X-ray pictures made, and they didn't show any injuries to the bony tissues at that time. . . . I could not discover, and did not discover, any injury to the bone at that time. . . . I had the X-rays taken the first day he was in the hospital. Those were the only ones as to any possible bone injury. No other X-rays were taken at that time, until he had left the hospital and had been gone some time." The X-ray pictures taken while plaintiff was in the hospital were not proffered in evidence on the trial. It is urged by appellant that plaintiff's witness, Dr. Peden, was permitted to base an opinion solely upon the opinion of another witness for plaintiff, Dr. Fitzgerald, that the X-ray pictures taken while plaintiff was in the hospital were negative as to bone injuries or disease, and that the trial court, in permitting Dr. Peden to express an

opinion that, if the X-ray examination made in the hospital was negative, there was no evidence of previous bone disease, violated the familiar rule that an inference may not be drawn from another inference, and that an opinion may not be based upon another opinion. However, no such objection was interposed by defendant. The objection, as made by defendant's counsel on the trial, was: "I object to what the original X-ray pictures show." Whatever defendant's counsel may have meant by such objection, it is clear that the objection did not inform the trial court that counsel was objecting on the theory or ground that one physician should not be permitted to base an opinion upon an opinion given by another physician. The trial court may not be convicted of error in over-ruling an objection on a theory or ground which was never brought to the court's attention. [Wagner v. Metropolitan St. Ry. Co., 160 Mo. App. 334, 341; Fearey v. O'Neill, 149 Mo. 467, 473; State ex rel. v. Blakemore, 275 Mo. 695, 706.]

It is claimed by appellant that the trial court erred in permitting plaintiff's medical witnesses to testify that plaintiff had suffered an injury to the sacroiliac joint, upon the ground that no such injury was pleaded in the petition. We have carefully examined the record and we find no such objection to have been made by defendant. So far as the record discloses, the testimony of plaintiff's medical witnesses, to the effect that plaintiff had suffered an injury to the sacroiliac joint, went in without any objection on the part of defendant. However, we think the injury was sufficiently described and pleaded in the petition, which alleged that "plaintiff's back, spine, abdomen, . . . and the bones, joints, muscles, tendons, tissues, membranes, ligaments, and vessels thereof, were seriously bruised, contused, lacerated, wrenched, mashed, crushed, inflamed and infected." It is a matter of almost common lay knowledge that the sacroiliac joint, anatomically speaking, is a part of the back. Dr. Fitzgerald was asked to define a sacral injury in ordinary terms, and answered: "To the laity that would be a sprained *back*." Dr. Barnes was asked whether he would define an injury to the sacroiliac joint as a strained back, and answered: "*Back* strain; I would use that in a pretty popular sense, just like an ordinary person would." We find no reversible error in the admission of evidence.

IV. Error is assigned in the refusal of the trial court to discharge the jury because of alleged improper remarks of plaintiff's counsel during the closing argument to the jury.

It appears from the record that, during the cross-examination of plaintiff's witness, Dr. Fitzgerald, by defendant's counsel, the following occurred:

"Q. Do you know what report I have reference to; do you know to whom you made this report? A. I made a report to an insurance company; I think that is it.

"Q. At whose request? A. Of the insurance company.

"Q. Who requested you, from the insurance company, to make that? A. I believe Mr. Lansing; I don't recall now, but I have—

"Q. (Interrupting): You think it was Lansing? A. I think I have correspondence in my files to that effect.

"Q. And you say that because you know that Mr. Lansing is an insurance man, don't you? A. No, sir.

"Q. Don't you know that Mr. Lansing has no connection with this case, and never did have any? A. I can't tell you. I said, 'I think.' I don't know definitely."

Later in the course of the trial, defendant offered Mr. A. B. Lansing as a witness, who testified that he was a practicing lawyer in St. Louis and represented quite a number of insurance companies. He testified further: "I think I know Dr. Fitzgerald. I never heard of this case and never requested Dr. Fitzgerald, or any other doctor, to make an examination in this case. None of the insurance companies I represent have any interest of any kind in this case."

The following occurred during the closing argument of the case by plaintiff's counsel:

"If plaintiff had been in a position to have produced more witnesses, gentlemen of the jury, he would have done so, but he has done the best he could, brought in all the reports we have, but still poor old Rockenstein has just got to be wrong about everything. Ah, gentlemen of the jury, I know you aren't going to believe all that, and then he brings Lansing over here to say that no one of Lansing's insurance companies is on this risk—

"DEFENDANT'S COUNSEL (interrupting): I object to that remark and move that this jury be discharged. I renew my motion made on yesterday that the jury be discharged because of the misconduct of counsel.

"PLAINTIFF'S COUNSEL: I submit that was Lansing's testimony.

"THE COURT: I will overrule the motion to discharge the jury. (Exception here taken by defendant.)

"DEFENDANT'S COUNSEL: I further object to that statement by counsel because it is improper, and I move that the jury be instructed to disregard it.

"THE COURT: I will overrule the motion. (Exception here taken by defendant.)"

It appears from the record that the defendant did proffer Mr. Lansing as a witness on the trial of the cause, and that the defendant's witness, Lansing, did say that he represented quite a number of insurance companies, and that none of the insurance

companies he (Lansing) represented had any interest of any kind in the instant cause. Thus, it appears that the witness, Lansing, testified substantially as stated by plaintiff's counsel in the latter's closing argument to the jury, and there was no misstatement by counsel of the purport of Lansing's testimony. As is said in 38 Cyc. 1485: "Counsel should not be subjected to unreasonable restraint in commenting on the evidence, but should be allowed a wide latitude, this being matter for the sound discretion of the trial judge." The matter complained of by appellant, however, seemingly was not thought by the trial court to be of such prejudicial nature as to warrant or require the discharge of the jury. We cannot say that the discretion of the trial court, in respect to the matter complained of, was not soundly exercised, and therefore we must deny appellant's assignment of error. [Busch v. Railroad Co. (Mo. Sup.), 17 S. W. (2d) 337, 340.]

Continuing his closing argument to the jury, counsel for plaintiff said: "Ah, gentlemen of the jury, he (defendant's counsel) knows that you aren't going to believe their defense, he is confident of that, and he is what we call around the courthouse as a low verdict man, and all he seeks to do, if you please, is to belittle—

"DEFENDANT'S COUNSEL (interrupting): I object to that—

"THE COURT (interrupting): The objection is sustained.

"DEFENDANT'S COUNSEL: That is an improper remark, as counsel well knows, and I ask that counsel be reprimanded for making such a statement in the presence of the jury.

"THE COURT: That was an unwarranted statement, there is no evidence of that.

"PLAINTIFF'S COUNSEL: I will withdraw that remark and apologize to the court for making it.

"DEFENDANT'S COUNSEL: That seems to be one of counsel's favorite stunts, to make a remark that he knows is in error and then withdraw it, just so he gets it to the jury."

It appears from the foregoing that defendant's objection to the statement of plaintiff's counsel that defendant's counsel was called a "low verdict man" around the courthouse was promptly sustained by the trial court, and that plaintiff's counsel was reprimanded (somewhat mildly, perhaps) by the trial court for making such statement, which statement the court told the jury was without evidence to support it. No further or sterner reprimand of plaintiff's counsel was asked by defendant, and no further action of the court in the premises was requested by defendant, and no exception was taken at the time, or thereafter saved, to any ruling or action of the trial court in the matter. In such state of the record, the matter is not reviewable in this court on appeal. [Torreyson v. United Railways Co., 246 Mo. 696, 706; Preston v. Railroad Co., 292 Mo. 442, 458; Busse v. White (Mo. Sup.), 274 S. W. 1046,

490

1049; Dittmeier Real Estate Co. v. Southern Surety Co. (Mo. Sup.), 289 S. W. 877, 890; Cullen v. Johnson (Mo. Sup.), 29 S. W. (2d) 39, 49.]

V. Lastly, it is urged by appellant that the verdict and judgment are excessive in amount. The testimony, both medical and lay, on behalf of plaintiff tends strongly to show that plaintiff sustained painful and, perhaps, permanent injuries. Between the date of his injuries and the date of the trial, the evidence shows, plaintiff was unable to pursue his trade as a journeyman carpenter, at which trade he had been earning an average weekly wage of $66, or approximately $3432 annually. Following his injury, and up to the date of the trial, he had earned only $700, so that his loss of earnings amounted to more than $2700 at the time of the trial. We do not view the amount of the verdict and judgment as being so large as to shock the judicial conscience, and we find no indications in the record that the jury were swayed by passion or prejudice, or otherwise unduly influenced. On the other hand, there is substantial evidence to support the pecuniary award made by the jury in their verdict. The trial court approved the verdict of the jury, and did not see fit to order a *remittitur,* although the excessiveness of the verdict was urged below in defendant's motion for new trial. Under such circumstances, the verdict and judgment will not be disturbed. [Laughlin v. Railway Co., 275 Mo. 459, 472; Manley v. Wells (Mo. Sup.), 292 S. W. 67, 69; Grott v. Shoe Co. (Mo. Sup.), 2 S. W. (2d) 785, 790.]

Other alleged errors are assigned, but appellant has not pointed them out or discussed them in his printed brief and argument, and such assignments of error must be treated as abandoned.

Our attention having been directed to no reversible error herein, it follows that the judgment *nisi* must be affirmed. It is so ordered. *Ellison* and *Ferguson, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.