CORA BALES v. KANSAS CITY PUBLIC SERVICE COMPANY, Appellant. —40 S. W. (2d) 665.

Division One, June 24, 1931.*

---

*NOTE: Opinion filed at October Term, 1950, March 31, 1931; motion for rehearing overruled at April Term, June 24, 1931.

*Charles L. Carr, E. E. Ball* and *E. M. Tipton* for appellant.

*Harry G. Kyle* and *Walter A. Raymond* for respondent.

SEDDON, C.—Action to recover damages for personal injuries suffered by respondent (plaintiff) while she was a passenger upon an electric street car controlled and operated by the receivers of the Kansas City Railways Company upon and along Prospect Avenue in Kansas City, Missouri. The receivers of the Kansas City Railways Company were the original defendants in the action. The petition charges the defendant receivers with negligence in the following respect:

"That on November 1, 1925, about seven P. M., plaintiff boarded one of defendants' northbound Prospect Avenue street cars, which had come to a stop at the regular stopping place on Prospect Avenue just south of the intersection of that street and Twenty-third street, both public streets in Kansas City, Jackson County, Missouri; that she paid her fare and became a passenger thereon; that she walked forward into said car; that, when she had reached a point about five feet in front of the rear vestibule of said street car, the agents and servants of the defendants in charge of the defendants' street car negligently started said street car forward with a sudden, violent and unusual jerk, as a result of which plaintiff was thrown backwards out of said car into said rear vestibule, and upon and against the floor of said car, with great force and violence," as a result of which plaintiff suffered certain detailed injuries.

The answer admitted the control and operation of the street car by the defendant receivers, and denied generally each and every other allegation of the petition.

At the commencement of the trial of the action, on June 1, 1927, the respective parties agreed in open court that the Kansas City Public Service Company, a corporation, had become the purchaser of the properties of the Kansas City Railways Company, and, by virtue of the terms and conditions of that purchase, had agreed to assume the liabilities of the receivers of the Kansas City Railways Company; that the Kansas City Public Service Company be substituted as the sole party defendant in the place and stead of the aforesaid receivers of the Kansas City Railways Company; that the substituted party defendant voluntarily waives service of process and enters its appearance as the defendant in the cause; and that the Kansas City Public Service Company, as the substituted defendant, adopts the answer and pleading of the original defendants, the receivers of the Kansas City Railways Company.

A trial of the action to a jury resulted in a verdict by nine of the jurors in favor of plaintiff in the sum of $10,000, and judgment was entered against the substituted defendant, Kansas City Public Service Company, in accordance with the verdict of the jury. After unavailing motions for a new trial and in arrest of judgment, the defendant was allowed an appeal to this court.

Since the appellant does not assign error in the refusal of its requested peremptory instruction, in the nature of a demurrer to the evidence, tendered at the close of plaintiff's evidence and renewed at the close of all the evidence, and since it is practically conceded in appellant's printed brief and argument that there was sufficient and substantial evidence to warrant the submission to the jury of the issue of negligence, upon the part of the operatives of the street car, an extensive statement of the evidentiary facts leading up to plaintiff's injury is unnecessary. Briefly stated, the evidence adduced by plaintiff tended to show the following facts: About seven o'clock on the evening of November 1, 1925, the plaintiff, her son, and her daughter, boarded a northbound Prospect Avenue street car, then being operated by the receivers of the Kansas City Railways Company, at the regular stopping place for the reception of passengers at the southeast corner of 23rd Street and Prospect Avenue. They entered the rear vestibule of the standing street car, plaintiff preceding her daughter, and the daughter being followed by plaintiff's son, who stopped for a moment at the conductor's fare box in the rear vestibule in order to pay the fares of the three passengers, which the son deposited in the fare box. Plaintiff stepped from the rear vestible into the body, or main part, of the car, and walked over to the east or right-hand side of the car toward a seat, some five or six feet in length, extending lengthwise with the car and parallel with the middle aisle thereof, with the intention of seating herself. As plaintiff turned around with her back to the seat, preparatory to taking a seat thereon, according to the testimony of plaintiff's witnesses, the car was started with a sudden, violent and unusual jerk or lurch, the force of which threw plaintiff off her feet, and caused her to fall a distance of one or more feet into the rear vestibule of the car, and upon the floor of the rear vestibule.

A passenger upon the car, who was seated near the rear vestibule, and who viewed the occurrence of plaintiff's fall, thus described the same: "Just as she (plaintiff) turned around, just like she was getting ready to sit down, the car gave a lunge, gave a lurch, and threw her back against that iron rod or railing, and she fell back on the back platform. Q. What effect did it have on you, as you were seated there in your seat, as the car started? A. It jerked me over like that way (indicating), jerked me over just like that. Q. Just describe in your own way—not what you thought, nor your conclusion—but just describe how the car started. A. Well, it started out in jerks, more than any other time I have ever noticed it to start when I was riding on them."

The plaintiff's son thus described the starting and movement of the car: "Well, it started with a jerk that was beyond—well, not a common jerk at all, it was just an unusual kind of jerk. It gave

that quick jerk; well, it wasn't a jerk, it was a lurch was what it was, and naturally at the end of the jerk it kind of stopped and went on again on its own motion. It didn't just jerk out and lunge smooth, but it made a quick jerk and kind of a jump, and go on, you see, to catch up to the speed of the motors.''

Plaintiff's daughter described the occurrence as follows: ''Mother got on first, and then myself, and then my brother, and then mother went on in, and she was going to be seated on one of the long benches —the car was going north, and she was going to be seated on the long bench that was on the east [right] side of the car, and I followed, and she had—she wasn't in the act of being seated, she was just limbering up, she hadn't started to be seated yet, and the car gave a violent lunging and threw her down in the vestibule.''

The plaintiff thus described the circumstance: ''I just turned around to sit down there, but the car just started up with such a sudden, unusual jerk that it just threw me clear off my feet, and I just went right down, and my hip struck—I call it the step—and I just went right down into the vestibule, just fell over into the vestibule, and this step, or the rod, or something, had struck my head. I didn't sit down and miss the seat. It just started with such an unusual jerk that it threw me clear to the floor and landed me out in the vestibule.''

The plaintiff was lifted from the floor of the rear vestibule of the car and placed upon the long seat at the rear of the main body of the car. After the car had proceeded northwardly some four or five blocks, plaintiff was removed from the car and carried into a drug store, where one of the defendants' employees telephoned for an ambulance, in which plaintiff was taken to the General Hospital, where she received emergency treatment and was placed in bed under the care of two surgeons. Several X-ray photographs were taken on the day after plaintiff's arrival at the hospital, which disclosed that plaintiff had sustained an impacted fracture of the neck of the left femur or thigh bone, just inside of the hip joint. One of the attending surgeons thus described the severity of the fracture: ''It is considered one of the very severe fractures, for the reason that the fracture occurs at a joint where it is difficult to get a union, and it is difficult to treat without leaving some deformity, usually occurring in people past middle life.'' After the reduction of the fracture of the left hip, plaintiff was put in a plaster cast. After remaining in the hospital for about one week, plaintiff was removed in an ambulance to her home, where she was confined in bed for a period of about three months, at the expiration of which period of time the plaster cast was removed by the attending surgeons, and the fractured hip was then enclosed in a brace, which plaintiff was using at the time of the trial, a year and a half after her injury. After

having been confined to bed for some three months, plaintiff was able to get about her home with the aid of crutches, which she continued to use, as an aid in walking, for about a year. The attending surgeon testified that the impacted fracture resulted in a shortening of the left femur bone which caused "a more or less tension on the muscles, and that muscle tension gives her [plaintiff] muscle fatigue, and in bad weather, cold or disagreeable weather, she experiences pain, and the feeling of rheumatic pains, in that region." The surgeons testified that the injury had resulted in a widening and separation of the bones or vertebrae of the sacroiliac joint, and a dislocation of the sacrum from the ilium, which caused plaintiff to suffer pain and tenderness about the region of the sacroiliac joint. The injury also caused a derangement in the functions of the urinary organs, resulting in too frequent urination, accompanied with pain in the urinary organs. One of the attending surgeons testified that, while the union of the hip bone was "a fair union for that type of injury, and as good as could be expected," there was some limitation in motion of the left hip at the time of the trial, although plaintiff did not walk with a "marked limp." The attending physicians testified that plaintiff's injuries had resulted in weakness in the left hip and in the sacroiliac joint, and that such resulting condition, in their opinion, is permanent. Plaintiff testified that she tired easily, and that she could not walk for any considerable length of time, or any great distance, without the aid of crutches or a cane.

Plaintiff was fifty years of age at the time of her injury. She testified that she had fallen from a wagon, when she was thirteen years of age, and injured her shoulder, which injury had resulted in a slight deformity and curvature of the spine. The physicians who attended plaintiff at the time of her late injury testified, however, that the injury which she had suffered in childhood had no bearing or effect upon her later injuries, and that none of the physical or bodily ailments and conditions resulting from the later injury was attributable to her childhood injury. Plaintiff testified that she had always been in good health prior to the injury in controversy, and had performed all of the usual household duties incident to her home, including the family washing and ironing, but that, since her injury, she had been unable to perform most of such household duties, being able to perform only such light work as she could do while sitting in a chair.

I. Appellant assigns error in the giving of plaintiff's Instruction No. 10, which reads as follows:

"The court instructs the jury that if you find and believe from the evidence that, at the time and place in question, as shown by

178

the evidence, the street car in question was stopped for the purpose of taking on passengers, if so, and that plaintiff boarded said street car, if so, paid her fare and became a passenger thereon, if so, then it was the duty of the agents and servants of the receivers in charge of said 'street car to start said street car gradually, and to avoid starting said street car with a sudden, violent and unusual jerk.''

It is claimed by appellant that said instruction imposes a greater or higher duty upon the defendant street-railway carrier than is required by law, in that the instruction purports to tell the jury that it was the duty of the operatives of the street car to start the car *"gradually,"* while appellant insists that the only duty imposed by law upon the street car operatives is not to start the car suddenly, violently, and with an unusual jerk. We perceive no erroneous statement or declaration of the law in the criticised instruction. The term ''gradually'' is but the antithesis of the terms ''suddenly'' and ''violently.'' The use of the term ''gradually,'' in our view, added nothing to the instruction by way of imposing any duty upon the operatives of the street car other than the duty prescribed by the rules of the common law, as uniformly announced and declared in numerous decisions of this court.

The duty or obligation of a street railway carrier toward a passenger who boards its street car was early declared by this court in Dougherty v. Missouri Railroad. Co., 81 Mo. 325, 330, as follows: ''With respect to the obligation of the defendant to the plaintiff as a passenger, it is sufficient to say, that while it is not an insurer of the safety of passengers, it is bound by its office, as such carrier, to exercise due care and vigilance, so as to safely transport them. . . . It should allow the passengers reasonable time to enter and take a seat, if there be one, or reasonable time to seize the straps furnished for passengers when standing; and while it may start its car before the passenger has had time to take a seat, or secure his hold on the strap, *it must exercise the utmost care in starting so as not to jar or upset him."* [Italics our own.]

The foregoing language from the opinion in the Dougherty case was approvingly quoted by this court in the recent case of Laible v. Wells, 317 Mo. 141, 145, 146, wherein we said: ''It is negligence to cause a street car to give a violent or unusual jar, jerk or jolt. This because such action places the passengers in peril. . . . Nor are we prepared to say that there is no liability if there is a violent and unusual jerk which causes injury to the passenger, simply because it may be thought that such 'violent or unusual jerk' was necessary to the starting of the car. To start a car with a violent and unusual jerk has always been denominated negligence in this State, for which there is liability. . . . Likewise, accelerating the speed of a

moving car by a 'violent or unusual jerk' has always been declared actionable negligence, if there was resulting injury.''

The opinion in the Laible case, supra, cites numerous decisions of this court, and of the several Courts of Appeals in this State, wherein the doctrine and rule of law prescribing the obligation and duty of a street railway carrier toward a passenger, as announced and declared in the Dougherty case, has been uniformly and consistently followed by our appellate courts. Those decisions are collated in the Laible case, and need not be cited or discussed herein.

Moreover, plaintiff's Instruction No. 10 must be viewed and considered in connection with plaintiff's main instruction, numbered 9, which purported to cover the entire case, and which authorized a verdict in favor of plaintiff, if and provided that the jury should find and believe from the evidence that ''the agents and servants of the receivers in charge of the said receivers' street car negligently started said street car forward with a sudden, violent and unusual jerk,'' and that as a direct result thereof plaintiff was injured. When the two instructions are read and viewed together, as a single charge to the jury, the term ''gradually,'' as used in plaintiff's Instruction No. 10 (if the use of such term can well be said to state and declare the carrier's duty too broadly), is qualified and rendered harmless by plaintiff's Instruction No. 9, which required the jury to find such a state of facts as clearly renders the defendant carrier liable under the applicable doctrine and rule of law announced in a long line of decisions of this court, beginning with the Dougherty case, supra. A too broad general statement (in an instruction) of the measure of legal duty owing by a defendant to a plaintiff may be qualified and rendered harmless by a call (in the same, or in another, instruction) for a finding of facts, by the jury, which renders the defendant liable under the correct rule of law on the subject. [Garard v. Coal and Coke Co., 207 Mo. 242, l. c. 259, 260; Bradley v. Railway Co., 138 Mo. 293, 308; Burdoin v. Town of Trenton, 116 Mo. 358, 371; Cassin v. Lusk, 277 Mo. 663, 674; Hutson v. Missouri Stair Co. (Mo. App.), 296 S. W. 216, 218.]

We think that the plaintiff's instructions numbered 9 and 10, when viewed singly and separately, or when viewed together (as they must be) as a single charge to the jury, properly and correctly declared the applicable rule of law in the instant case. The said instructions are not conflicting; nor do they broaden the issue of defendants' negligence as presented by the plaintiff's petition. Neither can it well be said that the said instructions were misleading to the jury, since the jury were required (by Instruction No. 9) to find and believe from the evidence, as a prerequisite fact leading to a verdict for plaintiff, that the operatives of the street car in question negligently started the car ''with a sudden, violent and unusual

jerk," the finding of which fact by the jury rendered the defendant carrier liable to the plaintiff passenger under the established and settled law of this jurisdiction. [Meyers v. Wells (Mo. Sup.), 273 S. W. 110, 114; Laible v. Wells, 317 Mo. 141, 147, and cases there cited.] The assignment of error must be disallowed.

II. It is urged by appellant that the trial court erred in permitting the medical witnesses on behalf of plaintiff to testify, over defendant's objections, that she had suffered an injury to the sacrum and the sacroiliac joint. The ground of the assignment of error is that no such injury is pleaded or specified in the petition. Among the several injuries pleaded and specified in the petition is the following: "Her back, spine and spinal column were bruised, contused, wrenched, sprained and twisted." The medical witnesses testified that the sacrum and the sacroiliac joint, in the anatomical sense and meaning, are a part of the back, and constitute a part of the spine, or spinal column. The "spine," or "spinal column," in mankind, is described and defined in Webster's New International Dictionary as including, among other, the five sacral vertebrae, which are fused together in the sacroiliac joint.

We regard the general allegation of the petition, above quoted, as being sufficiently broad and comprehensive to permit of the admission of medical testimony that plaintiff suffered an injury to the ·sacrum and the sacroiliac joint. This court has recently ruled that there is no reversible error in the admission of medical testimony that a plaintiff suffered an injury to the sacroiliac joint, where the petition alleged generally that "plaintiff's back, spine, abdomen . . . were seriously bruised, contused wrenched, mashed, crushed, inflamed and infected." [Rockenstein v. Rogers, 326 Mo. 468, 31 S. W. (2d) 792, 801.] ·See, also, Bridges v. Dunham (Mo. App.), 183 S. W. 703, wherein it was held proper to admit evidence of injury to the coccyx, under a general allegation of the petition that plaintiff's "spine and spinal column were bruised and injured." The assignment of error is denied.

III. Appellant seeks a reversal of the judgment herein because plaintiff's Instruction No. 12, on the measure of damages, informed the jury that "the total amount, if any, allowed the plaintiff cannot exceed the sum of $35,000, which is the amount sued for." The foregoing clause of the instruction is immediately followed by this cautionary clause: "Naming the amount sued for in this instruction should not influence you in arriving at a verdict, or its amount, if any, and is mentioned herein only for the purpose of informing you of the a-

mount for which plaintiff has sued.'' It is urged by appellant that the reference, in the said instruction, to the large amount sued for by plaintiff was an apparent attempt ''to coerce the jury into returning a very large verdict, out of all proportion to the injury sustained by the respondent.''

The giving of an instruction on the measure of damages which fixes a maximum amount which the jury may allow, without disclosing to the jury any reason why the court has fixed the maximum at the particular figure and amount named in the instruction, was strongly criticised, if not condemned, by this court in Bond v. Railway Co., 315 Mo. 987, 1007; nevertheless, following the old precedents, we held that the giving of such instruction in that case did not constitute reversible error, and that the excessive verdict therein was curable by *remittitur*. However, we are unable to see wherein it serves any good or useful purpose to inform the jury, in instructing them upon the measure of damages, that they cannot allow or assess the damages in excess of the amount sued for, and named in the instruction. We believe that the practice of giving such form of instruction should be discontinued by the trial courts.

We conclude, however, that the criticised instruction on the measure of damages, as given in the instant case, worked no harm or prejudice to the appellant herein, in that it is apparent to our minds, when we view the amount of the verdict, that the jury must have used their own judgment in arriving at the amount of the verdict, and seemingly ignored any suggestion or invitation, which may have lurked in the instruction, to assess the plaintiff's damages at a much larger amount. [Thompson v. City of Lamar, 322 Mo. 514, 546; Stahlberg v. Brandes (Mo. App.), 299 S. W. 836, 837.] The giving of such instruction does not constitute reversible error under the record in the present case.

IV. Lastly, it is urged by appellant that the verdict and judgment are excessive in amount. In the light of the testimony of plaintiff, the several members of her family, and her attending physicians, disclosing the nature and extent of plaintiff's injuries, her confinement to bed for a period of more than three months, her inability to get about, and to perform her household duties, as she formerly had been able to do, and the pain and suffering which followed as a result of her injuries, we cannot say that the amount of the verdict and judgment is excessive, or that we are warranted in requiring a *remittitur*. The verdict of the jury is supported by substantial evidence, and had the approval of the trial court, who saw and heard the plaintiff and her witnesses as they testified upon the trial, and who permitted the verdict to stand, although defendant, in its motion for new trial,

complained that the verdict is excessive. We have recently refused to disturb verdicts in the same amount as was returned by the jury herein, in cases where the injuries were almost identical with, or fairly comparable to, the injuries suffered by the respondent in the instant case. [Rockenstein v. Rogers, 31 S. W. (2d) 792, 802; Keyes v. Railroad Co., 31 S. W. (2d) 50, 66; Thompson v. City of Lamar, 322 Mo. 514, 548.]

Finding no reversible error herein, the judgment of the circuit court is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.