246 S.W.2d 356 (1952)
JONES
v.
TERMINAL R. R. ASS'N OF ST. LOUIS.
No. 28224.
St. Louis Court of Appeals, Missouri.
February 19, 1952.
*357 Warner Fuller, Arnot L. Sheppard and John P. Montrey, all of St. Louis, for appellant.
Samuel J. Goldenhersh and Goldenhersh & Goldenhersh, all of St. Louis, for respondent.
HOUSER, Commissioner.
This is an action against Terminal Railroad Association of St. Louis for damages for personal injuries sustained by Sylvester Jones, a produce company worker, while unloading potatoes from a railroad boxcar. In the course of a switching operation defendant's 100,000 pound railroad locomotive, which was pushing two other boxcars, collided suddenly and without warning with the boxcar in which plaintiff was working, thereby throwing plaintiff to the floor of the boxcar. From a judgment for $5,850 entered on a jury verdict the railroad association appeals for a reversal on three grounds: (1) that plaintiff's doctor was improperly permitted to testify to statements made by plaintiff to the doctor concerning his inability to work and the time lost from his employment; (2) that the trial court erred in overruling defendant's motion for a new trial when plaintiff's counsel read into the record incompetent hearsay testimony which appellant says plaintiff's counsel knowingly injected for the purpose of prejudicing defendant's case; (3) that the verdict is grossly excessive.
On the first point the record follows: "Dr. Scherman: * * * He returned to my office for three times weekly treatment and diathermy for a considerable time after that and as he improved we cut him down to (once?) a week, and he continued to complain of the pain over the lower back area; on about the first of April he began to complain of pain in the hip and down *358 the leg. * * * he did attempt to go back to work; as a matter of fact, he tried to go back to work before I released him. * * * as he was getting well, pain began to show up in his hip and down his leg, especially on heavy work; as I say, it was about that time, he was coming into my office once a week for diathermy, and on the 15th he reported he had been able to work two days, but had
"Mr. Sheppard: We object to that, your Honor, because that is hearsay, now.
"A. Well, he continued to haveexcuse me.
"The Court: Just omit that, that would be hearsay.
"A. I see; on the 15th of April he continued to complain of pain down the left leg; on the 22nd, that was a week later, he complained of little pain, but had not worked; on the 29th he had worked, and he had pain down the back of his leg; on the 13th of May he worked Monday and Tuesday
"Mr. Sheppard: I think that is again hearsay, your Honor.
"The Witness: In other words, I have to judge from what I heard from him as to how he is improving, or whether he is not improving, and so I
"The Court: Objection overruled. Go ahead, Doctor.
"A. He worked Monday and Tuesday at the Produce Company, only two days; the 20th of May he reported he had been fired from his job, he had trouble after working on a car on the 14th, on Sunday, the 14th of May.
"Mr. Sheppard: I move that be stricken out, your Honor.
"The Court: Yes.
"Mr. Sheppard: Highly prejudicial.
"Mr. Goldenhersh: Your Honor please, it would be intimately connected with the history of the case.
"The Court: The question of his employment does not have much to do with his medical history, and the jury will disregard that remark, that he was fired from the job; that will be stricken from the record; that is hearsay, that is what he told the doctor.
"The Witness: He left his work, and on the 27th of May, he was doing well without working; on the 8th of July he still had pain and tenderness over the left sacroiliac, pain on bending with weight; had worked three days in the past two weeks and then couldn't go to school, he was going to school at the same time, for four days; pain in the right hip and down the middle of the posterior thigh.
"Mr. Sheppard: It is understood, your Honor, I am objecting to all this as purely hearsay, is it?
"The Court: To all the statements about work, Mr. Sheppard?
"Mr. Sheppard: Well, all of the hearsay remarks that he made to the doctor about his work, inability to work and so on and so forth.
"The Court: Yes, that will be understood, your objection goes to that. The objection is overruled. Go ahead.
"The Witness: * * * on the 21st of July he had had a good week without work, on the 4th of August, working three days, was caused to have some trouble with his back; on the 18th of August he had worked several days and had considerable pain at the end of the day, and then on the 8th of September, the last time I saw him he was able to make about four days a week; rainy days making him worse, and some pain down the side."
The question is whether plaintiff's doctor, in his recital of his knowledge of the case, properly may give in evidence statements made by plaintiff to the doctor as to the number of days each week plaintiff had missed from his work, and plaintiff's statements that he had been unable to work on those days. These statements were made to the doctor while undergoing a series of weekly treatments, and the statements on the occasion of each visit apparently referred to the physical condition of the patient during the preceding week, or since the last visit to the doctor. The examinations and treatments given by the doctor finally totaled 40 in number.
*359 Appellant states its position thus: "The law forbids a plaintiff to establish his claim for recovery through the use of his doctor's repeating to a jury the plaintiff's self-serving statements regarding lost time from employment." Appellant is not claiming error in permitting the doctor to venture an expert opinion based in part upon hearsay statements of inability to work, or loss of work. Appellant is asserting the impropriety of proving inability to work and consequent wage losses in this manner.
Certainly the testimony of the doctor was hearsay evidence that Jones did not work and was unable to work on the particular days, for the doctor did not have or claim to have personal knowledge, but was repeating Jones' statements to the effect that he was unable to work at the times mentioned. Whether this type of hearsay evidence is admissible depends upon whether the patient relates to the doctor a present or past condition. Many cases from Holloway v. Kansas City, 184 Mo. 19, 82 S.W. 89, to Baumhoer v. McLaughlin, Mo.App., 205 S.W.2d 274, see Missouri Digest Evidence, 317(3), and 555, 22 C.J., Evidence, § 270, 31 C.J.S., Evidence, § 246, establish the rule that a doctor may give his expert opinion based upon this type of hearsay statement, and in the course of his testimony relate such hearsay statements, where the statements refer to the patient's then-existing, present symptoms, maladies and physical condition but that the doctor may not express the opinion, or relate the hearsay statements, where the statements refer to a past condition of the patient, or to circumstances surrounding the receipt of an injury, or to the manner in which it was received.
Under this rule the challenged evidence was improperly admitted in the case at bar because the statements of plaintiff related to the jury by Dr. Scherman referred to past physical conditions, viz. ability or inability to work and pain experienced during the week or two previous to the making of each such statement. The line of demarcation between statements of the patient which may be related by the doctor and those which may not in such instances is the line which divides the present from the past. Gladney v. Mutual Life Ins. Co. of N. Y., Mo.App., 186 S.W.2d 538.
The error in the admission of this testimony, however, was harmless. It concerned a special item of damages: loss of wages. Defendant did not contest plaintiff's claim that he was totally disabled for seven weeks after his injury or that during that period he lost wages at the rate of $56 per week. The contest was over the time and wages lost during the period following the first seven weeks of admitted total disability. That issue was hotly contested, but during the course of the presentation of the defendant's case the parties apparently came to an agreement, for there appears in the record a stipulation of the parties as to the exact amount of the earnings of the plaintiff on weekly paydays beginning September 3, 1949 and ending May 18, 1950. This included practically the whole of the time period covered in the improperly admitted testimony of Dr. Schernan. The parties having thus agreed on the plaintiff's earnings during this period, the error in admitting Dr. Scherman's testimony was largely rectified. If the error was not thereby cured it was thereafter fully remedied because Instruction No. 3, given to the jury, specifically limited the recovery for loss of earnings to the sum of $350, which, indeed, was less than the amount shown by the evidence to have been lost by plaintiff in the seven week period during which defendant concedes plaintiff could not work. This point is ruled against appellant.
Next, appellant complains that plaintiff's counsel "deliberately and intentionally read into the record testimony which he well knew was incompetent as hearsay for the sole purpose of prejudicing defendant's case." The matter arose in connection with the examination by plaintiff's counsel of William W. Smee, a switchman helper employed by defendant, who was acting as a coupler in the operation which injured plaintiff. In his deposition Smee testified that the yard foreman, Charles Alcorn knew that the crew was bringing a switch engine onto the Hollmann Produce Company spur, and that Alcorn told Smee that he would notify the employees of the produce *360 company that the Terminal was coming in with the cars. Smee testified at the trial, and there was abundant other testimony, that there was a custom for the railroad employees to go onto the loading docks to warn employees of the produce company working in and out of the railroad cars and to see that no one is working thereon, before conducting a switching operation. At the trial Smee testified that neither he nor any Terminal employee to his knowledge went onto the docks to "pull those men out of the car." Counsel then asked Smee if there was an understanding that night between Smee and Alcorn as to who was to advise the Hollmann employees that the cars were going to be switched. Smee answered, saying that he did not know whether Alcorn did or not; that "we always look to see if any men were working in the cars before we come in on any track." Plaintiff's counsel, thinking that Smee had misunderstood the question, said:
"Let me refresh your memory. Do you remember when your deposition was taken? A. Yes, I do.
"Q. Do you remember me questioning you, Mr. Smee, at that time? A. I recall something you asked me if he had notified Hollmann.
"Q. I asked youI am asking you now, whether there was an understanding as between your men
"Mr. Sheppard: What page is it?
"Mr. Goldenhersh: On page 16 of the deposition.
"Q. I asked you this: `Do you know of your own personal knowledge whether or not the yardmaster notified them? A. No, I don't.' `Did he ever tell you that he notified them?'
"Mr. Sheppard: We object to that, of course, because it is hearsay.
"Mr. Goldenhersh: Well, all right, then; but go to the next questiondo you remember this answer
"Mr. Sheppard: Where is that?
"Mr. Goldenhersh: Page 17. `Well, he knew we was coming in with the cars,' referring to Mr. Alcorn, `and he said he would notify them. I am taking his word he did notify them.' Do you remember that answer?
"Mr. Sheppard: Your Honor, counsel has apparently deliberately read that last part of that answer, which is, of course, a thousand percent hearsay.
"Mr. Goldenhersh: Well, now
"Mr. Sheppard: That is just what I objected to a moment ago, it is wholly incompetent, and I don't think counsel should have read it, knowing I had objected to it."
There was a discussion off the record between court and counsel out of the hearing of the jury. When proceedings were resumed counsel for the plaintiff withdrew the question, whereupon the following ensued:
"Mr. Sheppard: I think possibly your Honor, I think that is rather highly damaging, and I think maybe I should ask for a mistrial.
"The Court: Motion overruled; the jury is instructed to disregard the passage of the deposition just read by Mr. Goldenhersh of this witness."
Counsel for appellant brands the conduct of plaintiff's counsel as so highly damaging, injurious and prejudicial that a mistrial was required; claims that it was an effort to impress the jury by means of incompetent hearsay testimony with the fact that Alcorn, defendant's yardmaster, felt that it was his duty to issue a warning of the coming movement of the freight cars. Appellant cites the cases of Trent v. Lechtman Printing Co., 141 MoApp. 437, 126 S. W. 238; Page v. Unterreiner, Mo.App., 106 S.W.2d 528; Aqua Contracting Co. v. United Rys. Co. of St. Louis, Mo.App., 203 S. W. 481; McClendon v. Bank of Advance, 188 Mo.App. 417, 174 S.W. 203, 205, in support of this assignment. Each of these cases reveals a much more aggravated and serious condition than appears in the case at bar. In three of them counsel improperly, and in bad faith, injected into the case the fact that defendant was protected by an insurance carrier, thereby poisoning the minds of the jury and prejudicing the defense of the case. In the McClendon case "plaintiffs persisted and insisted, in an effort to introduce evidence entirely irrelevant, *361 incompetent, and foreign to the issue, after the court had repeatedly denied the right to do so, and the evidence so offered was of a character calculated to prejudice the minds of the jurors against defendant and its cause." While we do not condone the action of counsel in the case at bar, fully recognizing that he erred in pressing an inquiry which he must have known would elicit hearsay testimony, we cannot hold that this infraction was so reprehensible and damaging as to require appellate interference. The error was sought to be corrected by the action of the trial judge in directing the jury to disregard the passage read from the deposition. The trial judge, who had every opportunity to appraise the situation as it occurred in the courtroom, was not moved to discharge the jury at the time, nor, after time for greater deliberation, to grant a new trial on this account. Where the improper evidence adduced is so foreign to the issue and so inherently poisonous that an admonition of counsel, withdrawal of the question, or direction by the court to disregard cannot possibly rectify the mischief done an appellate court should intervene notwithstanding the trial court in its discretion determined that prejudicial error did not occur. That, however, is not the case here. One of the principal issues raised by the petition and submitted to the jury by way of instructions was the failure of defendant's agents to give any notice or warning to plaintiff of its intention to switch additional cars into the siding where plaintiff was working. If in fact Alcorn, the yardmaster, knew of the impending switching operation and informed Smee that he would notify the Hollmann employees of the loading dock of the coming movement of the freight cars, such a fact would be material and competent, if established by admissible evidence. Such evidence would indicate knowledge on the part of the yardmaster of the danger to the employees of the produce company and recognition of the legal duty to notify them. Therefore, although the method of attempting to prove this fact was improper, the thing sought to be proved was not irrelevant. The custom of giving notice to the produce company employees in such a situation had been properly established by competent evidence. Under these circumstances the action of the trial court in instructing the jury to disregard the passage containing the hearsay was sufficient. We cannot convict the trial court of reversible error in this connection.
The last assignment of error is that the verdict of $5,850 is grossly excessive. Appellant contends that plaintiff suffered little more than bruises; lost wages totaling only $318.15; that his income after the injury was considerably higher than before; that he has missed only three days from work at his present employment; that the testimony of the medical experts reveals no unfavorable prognosis, but contains only vague references to contusions, sprains, irritation and inconvenience; that a verdict in this sum is unreasonable, against good conscience, and so excessive as to shock the judicial sense of right.
We must consider plaintiff's injuries in that view of plaintiff's evidence which tends most strongly to sustain the award. Schwinegruber v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 782. Prior to the injury plaintiff, 40 years of age, had been employed regularly for more than three years by the Hollmann Produce Company, engaged in the heavy work of unloading boxcars and loading trucks with produce. Much of his work was the handling of 100 pound sacks of potatoes, which he was able to handle in such a way as to "put out a night's work every night." In the collision on January 20, 1950 plaintiff was knocked to the floor of the railroad car and hurt his hip. After trying to work for half an hour plaintiff was obliged to quit and was taken to a hospital where he was X-rayed. He complained that he had a "real sharp pain from my hip, from my back, it extended down my leg." The next night he was taken to another hospital where he received diathermy treatments twice a day for 8 days. Thereafter he went to Dr. Scherman's office three times a week for a while, later once a week, for a total of 40 visits. He received heat treatments "to dry that misery, to get that misery out of my back." He was also required to take exercises, and bend his back forward, backwards *362 and sideways. He returned to work at Hollmann Produce Company the week ending March 9 and in the meantime lost wages amounting to $1.10 an hour, or approximately $56 a week. After his employer "got on him" about not working steadily, he worked regularly for the next five weeks "and then my back got so bad I had to lay off and after they saw I couldn't make it, they had to let me go and put another man in my place." At that time his back was "very bad", giving him "an awful lot of trouble". Dr. Scherman sent him to a neurological surgeon, suspecting injury to an intervertebral disc, but such an injury was not revealed. Plaintiff later found a lighter type of job handling small crates weighing about 20 pounds, at Hamm Produce Company. He testified that on account of his back he had lost something like 10 days' work at his present job. Plaintiff testified that at times his back feels good and at other times it gives him lots of trouble, pain, misery that extends down his leg, accompanied by "awful headaches". It is a throbbing, sharp pain that runs from his back to the muscles of his leg. At times he cannot sit comfortably in a chair. His wife rubs him with alcohol and he takes aspirin. At Hollmann Produce Company he earned $56 a week if he worked steady; at Hamm $60. At the time of the trial he was working steadily and had been for some time.
The hospital records showed that on the date of admission the patient complained of acute pains over the left sacroiliac; that the examination of the X-ray was negative for bone injury; that he was given sedatives and diathermy; that three days later he was much improved but still complained of tenderness and pain over the left sacroiliac region; that on the 27th of January he was improving but had pain locally and increased ability to move his back without pain, and indicated that diathermy was to be continued. On the next day he was discharged with instructions to continue to take diathermy treatments at the doctor's office. During his stay at the hospital a fracture board was placed under the mattress and he was given diathermy treatments twice a day.
Dr. Scherman testified that on the first examination plaintiff complained of very acute tenderness over his left sacroiliac; that there was an obvious swelling there; that there was considerable limitation of motion and acute pain attending movement of his legs. He confirmed the giving of narcotics, deep heat treatment, diathermy, immobilization as reported in the hospital records, and testified that after he left the hospital he received considerable diathermy treatments at his office. His final conclusion: that plaintiff sustained a severe lumbosacral contusion which resulted in a lumbosacral sprain and he secondarily developed an irritation of the sciatic nerve on the left side. He opined that internal scar tissue formed, effecting limitation of motion of the back, and an increased amount of pain because of inability to move. He further testified: "At the present time I would say that his present complaints are the result of his injury, and that they are more or less permanent at this time because a certain time has elapsed sufficient to produce either a complete cure or a residue likely to be permanent." He stated that in the future he thought it likely that plaintiff would have "recurrences of more or less acute pains and necessarily will seek the aid of a doctor for relief"; that there is no surgical cure; that home remedies would include massage, heat and aspirin; that condition of plaintiff is static with no change or improvement at trial time in November, 1950 since July, 1950. He further stated that a reasonable charge for the medical services is $500.
Dr. G. C. Lyttle examined plaintiff a few days before trial. He found some limitation to straight leg raising, causing complaint of pain in the hip on either side; stated that raising of the leg with knee flexed is accompanied by complaint of pain in the left hip and sacroiliac region; that in testing for hypesthesia there was lessened sensation on the lateral surfaces of the left thigh and leg; that flexion of the lumbar spine was slightly limited, causing pain and a sensation of slipping in the region of the left sacroiliac joint; that flexing of the spine to both right and left caused some complaint; and that pressure *363 over the left lumbosacral region caused pain. His conclusion: there are "enough objective symptoms to indicate that Mr. Jones was still suffering some inconvenience as a result of an injury to his left lumbosacral region"; that it could be permanent.
The verdict in this case was liberal, considering the injuries and damages. The question is whether it transcends the bounds of reasonable compensation. One standard by which the size of verdicts is to be tested is the rule requiring reasonable uniformity in the amounts allowed in comparable factual situations. For somewhat similar injuries our appellate courts have permitted judgments to stand in the following amounts in the following cases, decided in the years indicated: $5,000, Smith v. St. Louis Public Service Co., Mo. App.1950, 235 S.W.2d 102; $10,000, Zichler v. St. Louis Public Service Co., 1933, 332 Mo. 902, 59 S.W.2d 654; $5,833.33, Jones v. Kansas City Public Service Co., 1941, 236 Mo.App. 794, 155 S.W.2d 775; $10,000, Rockenstein v. Rogers, 1930, 326 Mo. 468, 31 S.W.2d 792; $7,000, Hilderbrand v. St. Louis-San Francisco R. Co., 1927, 220 Mo.App. 1229, 298 S.W. 1069. While the nature and extent of the injuries and the amount of special damages is never the same in any two cases, these cases are sufficiently close on the facts to justify our conclusion that appellate interference is not indicated, judged by this standard. Incidentally, in Harding v. Kansas City Public Service Co., Mo.App., 188 S.W.2d 60, cited by appellant, wherein a $5,000 verdict was held to be excessive by $2,000, the injuries were less severe and the special damages were considerably less than in the case at bar.
We further take note of the fact that the current purchasing power of the dollar was at a low mark when this verdict was rendered; that if plaintiff is entitled to recover he is entitled to reasonable compensation; that special damages of approximately $850 were shown; that this verdict and judgment met the approval of the trial judge; that appellate courts should not interfere with the exercise by the jury in the function of assessing damages except where the verdict is so large that it is manifestly unjust; that a verdict is excessive when it offends against all sense of right and shocks the judicial conscience. Schwinegruber v. St. Louis Public Service Co., supra. Considering all of these elements we are unable to conclude that it is grossly excessive, or that it reflects bias, prejudice, passion and misunderstanding of its proper function on the part of the jury as contended by the appellant.
The Commissioner, therefore, recommends that the judgment be affirmed.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, affirmed.
BENNICK, P. J., and ANDERSON and HOLMAN, JJ., concur.