Vernon **PELSTER**, Michelle Pelster, Appellees,

v.

Gary **RAY**, Cletus Grace, doing business as U.S. Wholesales, Defendants,

Earl Wayne Morton, Joyce Morton, doing business as South Central Auto Auction, Appellants.

No. 92–1036.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1992.

Decided March 3, 1993.

---

**3.** We intimate no view on whether Rost has any grounds for relief under 28 U.S.C. § 2255.

Alan G. Kimbrell, St. Louis, MO, argued, for appellants.

John Rauscher, St. Louis, MO, argued (Richard Baugh, on the brief), for appellees.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

Vernon and Michelle Pelster bought a used car on which the odometer had been rolled back. The Pelsters brought claims against Gary Ray and Cletus Dwight Grace for rolling back the odometer. They alleged separate counts under federal and state odometer statutes and Missouri's common law of fraud. The Pelsters brought similar claims against Earl Wayne Morton ("Wayne Morton") and Joyce Morton for passing the rolled-back car through their wholesale auto auction, the South Central Auto Auction ("South Central"). By consent of the parties, the case was tried before a magistrate judge and jury. The jury found for the Pelsters, assessing both compensatory and punitive damages against all four defendants. Ray and Grace were not present at the trial and have not filed an appeal. The Mortons, however, appeal from the district court's entry of judgment. They challenge the magistrate judge's denial of their motions for a directed verdict, the jury instructions, the admissibility of the testimony of the plaintiffs' chief witness, and numerous other rulings by the magistrate judge. Concluding that errors prejudicial to the defendants were made at trial, we reverse the district court's judgment and remand the case for a new trial.

## I.

The Pelsters began their odyssey through the world of used cars in the fall of 1988. Like countless other American families, they determined that they had outgrown their present automobile and decided to look for a dependable low-mileage used car that could accommodate "the kids and stuff." In the course of their car shopping, the Pelsters discovered a four-door 1986 Oldsmobile Cutlass Ciera (the "Ciera") on the lot of Modern Auto Co. ("Modern Auto") in Washington, Missouri. The Ciera was clean and appeared to have a low number of miles (37,344) on it. After a test drive and the usual thrust and parry of negotiation, the Pelsters bought the Ciera for $7400, plus additional charges for a service agreement and financing.

As the Pelsters later learned, their new purchase was hardly the meticulously cared-for cream puff that all used car buyers dream about. Instead, the Ciera had just completed its travels through the shadowy netherworld of used car wholesalers and dealers. It had entered that world as a high-mileage lease car; by the end of its journey, however, the Ciera had emerged with the rejuvenated outward appearance of a clean low-mileage dream car.

Kevco Limited, an Ohio leasing company, originally bought the Ciera in December 1984 from a dealership in Columbus, Ohio. As is customary in the auto leasing business, Kevco Limited leased the Ciera for approximately two and a half years, and then in August 1988 sold the Ciera to Chase Motors, Inc. ("Chase Motors"). At the time of the transfer, Kevco Limited certified to Chase Motors that the Ciera's odometer reading of 95,804 miles was correct. Chase Motors obtained a new Ohio title, on the front of which was written the 95,804 mileage figure representing the miles on the car at the time Chase Motors bought it. A copy of this title was retained by the Clerk of the Court of Common Pleas for Franklin County, Ohio, whose duty it is to retain automobile title records.

A few weeks later, Chase Motors sold the car to U.S. Wholesales through the Ohio Auto Auction. According to the Ohio Auto Auction check-in sheet, the mileage on the Ciera at that point was 96,242. U.S. Wholesales, or at least a group of individu-

als involved with U.S. Wholesales, appears to have been in the business of rolling back the odometers on used cars. U.S. Wholesales was a registered car dealer licensed to operate in Paragould, Arkansas, although it apparently conducted its operations in Murray, Kentucky. Information concerning the ownership, organization, and membership of U.S. Wholesales is sketchy, at best; it appears, however, that at least twenty or more individuals were involved with the organization in some manner. Those individuals included Dave Manier (identified by some as the owner of U.S. Wholesales), Larry Shelton, Gary Ray, Aaron "Red" Morris, Cletus Dwight Grace, and Tommy Jones. (The organization and all of these individuals will be collectively referred to as "U.S. Wholesales.")

On September 7, 1988, Dixon Motors of Washington, Missouri, bought the Ciera from U.S. Wholesales at South Central's weekly auction. Dixon Motors received the Ohio title listing Chase Motors as the owner of record. The mileage figure on that title stating the number of miles on the odometer at the time Chase Motors had purchased the vehicle had been changed from 95,804 to 35,804. In the reassignment section on the title's back, the writing showed that Chase Motors had sold the Ciera to U.S. Wholesales with a mileage reading of 36,242.

It is unclear exactly how the paperwork for the transfer between U.S. Wholesales and Dixon Motors changed hands. The paperwork does show that U.S. Wholesales and Dixon Motors did not complete the space for a second reassignment on the back of the Ohio title; instead, Dixon Motors received a separate Arkansas Dealer's Reassignment of Title form (the "dealer's reassignment") from U.S. Wholesales. Dealers and wholesalers commonly use such reassignment forms when transferring vehicles among themselves rather than completing the reassignment section on the back of the title itself. The dealer's reassignment contained what purported to be the signature of Dave Manier on behalf of U.S. Wholesales as seller. According to the dealer's reassignment, Manier's signature had been notarized by Vorea Tackett on September 6, 1988. It remains unknown who actually signed the dealer's reassignment (whether it was Dave Manier or somebody else on his behalf) and who Vorea Tackett was.

In her deposition, which counsel for the Pelsters read into evidence at trial, Joyce Morton admitted that she had completed part of the dealer's reassignment. She testified that she had written "miles 36904" near the top of the dealer's reassignment. She also testified that she had filled in Dixon Motors's name and address as buyer.

After Dixon Motors had obtained a fresh Missouri title in its own name, it sold the Ciera to Modern Auto on September 19, 1988. Dixon Motors completed the first reassignment section on the back of its Missouri title and there certified that, to the best of its knowledge, the Ciera had travelled 36,968 miles as reflected on the odometer. It is unknown what other representations, if any, Dixon Motors made to Modern Auto.

As noted above, the Pelsters ultimately purchased the Ciera from Modern Auto. In addition to giving the Pelsters a vehicle invoice describing the terms of the sale, Modern Auto reassigned the Ciera's title to the Pelsters by completing a second reassignment on the back of the title that Modern Auto had received from Dixon Motors (the Missouri title listed in Dixon Motors's name). Also, as required by federal and Missouri law, Modern Auto completed an odometer statement certifying that, to the best of its knowledge, the Ciera's actual mileage was 37,344 and the odometer had not been altered or repaired. Vernon Pelster signed this odometer statement to acknowledge that he had received it.

The Pelsters first learned of the Ciera's true history when they received a letter from Tom Ley, an investigator for the Missouri Department of Revenue. The Pelsters subsequently filed this suit.

Both Vernon and Michelle Pelster testified that they had relied on the odometer itself and the odometer statement provided by Modern Auto in making their decision to

purchase the Ciera. When asked what the value of the Ciera would have been to him if he had known that the vehicle had over 97,000 miles, Vernon replied, "Maybe five hundred dollars or a thousand dollars, but I know—I doubt if it'd be one that would even interest me."

The Pelsters called Tom Ley to the stand. Ley described himself as a criminal investigator specializing in vehicle theft and odometer fraud for the Missouri Department of Revenue. In outlining his qualifications and work experience, Ley stated that he had conducted 50–60 odometer fraud investigations in the five years that he had worked for the Department of Revenue.

Ley described the general investigative techniques that he customarily uses in his work. He testified that he attempts to trace a vehicle's title history back through its various owners to the manufacturer. He stated that in the course of an investigation he speaks with dealers and obtains from them whatever documentation they can provide, usually titles, odometer statements, repair records, and bills of sale. He further stated that he also talks to auto auctions; he seeks similar documents from them, often including the auction's check-in sheets (also known as "block sheets"), which contain a description of the car and its current odometer reading. He testified that he contacts former owners of the vehicle, seeking oral and written information about the vehicle's mileage. Finally, he stated that he obtains copies of titles, odometer statements, and other documents from government agencies in the various states in which the vehicle had been titled. He testified that he had followed this procedure in investigating the roll-back of the Ciera.

Ley described generally how the roll-back game operates. He explained how people alter or roll back a car's odometer. Ley also explained how people physically alter the vehicle's documentation (titles and odometer statements) to match the new numbers on the odometer. Finally, over the Mortons' objection, Ley testified regarding the general reputation among deal-ers and auctioneers as to where rolled-back cars originate. He stated that, according to the reputation, rolled-back cars often come from Kentucky; Paragould, Arkansas; Oklahoma; Texas; and Lebanon, Missouri.

Counsel for the Pelsters then directed Ley's testimony to the history of the Ciera. Counsel walked Ley through the various documents that accompanied the Ciera through its transfers, including copies of titles, odometer statements, and auction check-in sheets. Having explained the contents of these various documents, Ley opined that the Ciera had been rolled back during the time that it was in the possession of U.S. Wholesales and before it passed through South Central.

Counsel then led Ley through a more general discussion of his investigation of U.S. Wholesales and South Central. This testimony included a discussion of four cars (the "PH & H cars") originally owned by Peterson, Howell & Heather, a large auto leasing firm. Over the Mortons' objection, the magistrate judge admitted documents showing that the four PH & H cars had passed through South Central and W.W. Motors (Wayne Morton's separate auto dealership located in West Plains, Missouri) in late 1988, and that the odometers had probably been rolled back during the time they were in the possession of South Central or W.W. Motors. All of this testimony constituted "similar acts evidence," which the Pelsters offered to prove that the Mortons knew that U.S. Wholesales was selling rolled-back cars through their auction and that the Mortons intended for subsequent purchasers to rely on false mileage representations made on the vehicles' titles and odometer statements.

Finally, counsel asked Ley to provide the general results of his investigation of U.S. Wholesales and South Central. Over the Mortons' objection, Ley testified that he had investigated 350 vehicles that had passed through South Central. Of those 350 cars, Ley testified that 300 of them had been rolled back when they went through South Central. Ley also testified that he had investigated 210 cars that U.S. Whole-

sales had rolled back. Of those 210 cars, Ley stated that U.S. Wholesales had sold 204 of them through South Central.

Counsel for the Pelsters also read into evidence excerpts from Wayne Morton's deposition. Wayne Morton testified that he had been involved in the automobile business since 1960, spending much of that time working as an employee or owner of auto auctions. He stated that in March 1988 he had started up South Central with Joyce Morton (then known as Joyce Adams), Clarence Page, and Suzanne Jones, verbally agreeing that all four would share the auction's profits. He testified that between March 1988 and January 1989, South Central handled approximately 200 to 250 cars per week. He asserted that part of his duties at South Central had included "supervising the office," yet he denied that he had known what paperwork was passing through the office and how the office workers were handling that paperwork. He further denied having any knowledge that Joyce Morton had been signing or notarizing titles and odometer statements for vehicles that had been sold at South Central, although he identified her signature on several titles and odometer statements at his deposition.

He admitted that Mel Dixon, owner of Dixon Motors, told him at some point during South Central's brief existence that Dixon Motors was being forced to buy back some cars that it had bought from U.S. Wholesales at South Central. He further admitted that Mel Dixon had said that the repurchase was due to "odometer discrepancies" with the cars. He stated that he had instructed Mel Dixon to meet with U.S. Wholesales at the next auction and settle the problem. He admitted that he had continued to do business as usual with U.S. Wholesales after he had received this notice that U.S. Wholesales had sold rolled-back cars at his auction. In fact, U.S. Wholesales was the largest volume seller of cars at South Central during its existence.

Wayne Morton also admitted personally rolling back and selling three cars in December 1988. He did this under the name of W.W. Motors and did not sell the three cars through South Central. He admitted in his testimony that he had pled guilty to charges involving the roll-back these three cars. The Pelsters subsequently offered into evidence Wayne Morton's record of conviction on three counts of mail fraud relating to the three rolled-back cars.

Finally, counsel for the Pelsters read into evidence excerpts from Joyce Morton's deposition, in which she stated that she had worked in the office at South Central. She testified that her duties had included writing checks, collecting accounts receivable, handling payroll, and taking care of the paperwork on sale days. Contrary to her husband's description of South Central's procedures, she stated that she and her co-workers in the office customarily had filled out titles, dealer reassignments, and odometer statements on behalf of both buyers and sellers at the auction. She stated that in completing such paperwork she and her co-workers had merely transferred the mileage numbers from the check-in sheets without verifying their accuracy. She admitted that she had signed Dave Manier's signature on behalf of U.S. Wholesales several times and that she had often notarized Manier's signature when in fact one of her co-workers had signed his name. As noted above, she specifically admitted writing "miles 36904" on the dealer's reassignment for the Ciera.

The Mortons did not offer any testimony in their defense. At the conclusion of the Pelsters' case, the Mortons each moved separately for a directed verdict, which the magistrate judge denied. Although the Pelsters had alleged claims under both federal and state odometer statutes, they elected to submit the case to the jury solely on the common law fraud count. The magistrate judge accordingly instructed the jury only on the fraud theory, including, over the Mortons' objection, an instruction on punitive damages. The jury returned a verdict in favor of the Pelsters, awarding actual damages in the amount of $6400 and assessing punitive damages in the amount of $50,000 each against Grace, Ray, and Wayne Morton, and $25,000 against Joyce Morton.

## II.

◼ The Mortons initially challenge the magistrate judge's denial of their motions for a directed verdict.[1] To survive the motions for a directed verdict, the Pelsters needed to produce sufficient evidence to allow a reasonable jury to find that they had proven the following elements of Missouri common law fraud with respect to Wayne and Joyce Morton:

(1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. . . .

*McMahon v. Meredith Corp.*, 595 F.2d 433, 438 (8th Cir.1979) (citing *Wood v. Robertson*, 245 S.W.2d 80, 82 (Mo.1952)). By denying the Mortons' motions for a directed verdict, the magistrate judge ruled, in essence, that the Pelsters had introduced enough evidence to meet their burden on each of these elements as interpreted under Missouri law.

In reviewing the denial of a motion for a directed verdict, an appellate court must:

consider the evidence in the light most favorable to the prevailing party, assuming as true all facts that the prevailing party's evidence tended to prove and giving him the benefit of all favorable inferences that reasonably may be drawn from the proven facts. If, in light of the above, reasonable jurors could differ as to the conclusions that could be drawn from the evidence, the court must deny the motion for a directed verdict.

*Hughes v. Box*, 814 F.2d 498, 501 (8th Cir. 1987) (quoting *Country Shindig Opry, Inc. v. Cessna Aircraft Co.*, 780 F.2d 1408, 1411 (8th Cir.1986)). Applying this standard, we find that the district court did not err in denying defendants' motions for a directed verdict.

The Mortons argue that the Pelsters have been unable to produce any evidence to support a finding that either of the Mortons made a representation regarding the Ciera's mileage. We will address this issue as to Joyce and Wayne Morton in turn.

As stated earlier, Joyce Morton admitted that she had written "miles 36,904" on the dealer's reassignment given to Dixon Motors at the auction. Joyce Morton argues that her copying of the mileage from South Central's check-in sheet onto the dealer's reassignment was not a representation but merely a ministerial act. She asserts that she did not adopt the dealer's reassignment as her own and that any representations on the dealer's reassignment were made by the individual who signed it (purportedly Dave Manier on behalf of U.S. Wholesales). She analogizes her act to a secretary typing a letter, asserting that the secretary does not thereby make a representation.

We find the analogy inapposite. A secretary types another's words at the direction of the author. Here, no principal compelled Joyce Morton's actions. She wrote the mileage figure on the dealer's reassignment of her own accord. Although she may not have adopted the entire dealer's reassignment as her own by her actions, we believe that a jury could reasonably find that her writing constituted a representation.

Wayne Morton also argues that the Pelsters did not produce any evidence that he made a representation regarding the Ciera's mileage. He asserts that there is no evidence that he was even at South Central on the date that the Ciera was auctioned. Thus, he concludes that the magistrate judge erred in not granting his motion for a directed verdict.

We disagree with this conclusion for two reasons. First, the Pelsters alleged in their complaint that Wayne and Joyce Morton were operating South Central as a partnership. In their brief to this court, the Mortons admitted that they had formed a

---

**1.** Now entitled a motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50(a) (as amended effective December 1, 1991).

partnership with Clarence Page and Suzanne Jones in setting up South Central. It is a fundamental rule of partnership law that one partner is liable for the actions of another partner if the second partner commits a wrong within the scope of the partnership's business or within the scope of the partnership agreement. Mo.Ann.Stat. §§ 358.120, 358.150 (Vernon 1968); *see also Reed v. Sale Memorial Hospital and Clinic,* 698 S.W.2d 931, 939 (Mo.Ct.App.1985); *Martin v. Barbour,* 558 S.W.2d 200, 209 (Mo.Ct.App.1977).

We believe that the Pelsters introduced sufficient evidence to support a finding that Joyce Morton made a representation within the scope of South Central's normal operation and with the approval of South Central's other partners. Joyce Morton described the common practices of South Central's office. She admitted that on a daily basis she and her coworkers (including partner Suzanne Jones) had improperly completed, signed, or notarized titles, reassignments, and odometer statements. Wayne Morton stated that he had attended nearly all of the auctions that were held at South Central during its existence and that part of his duties at the auction included "overseeing the office, bossing the office." The pervasiveness of the improper paperwork, showing a complete indifference to the accuracy of odometers on cars passing through the auction, could lead to a reasonable inference by the jury that Wayne Morton knew and authorized the reckless actions taken by his partners and employees. Such a finding would, in effect, make Joyce Morton's representation regarding the Ciera's mileage his own.

■ Additionally, the trial court ultimately instructed the jury regarding Wayne Morton's liability on a fraudulent concealment theory. A finding of fraudulent concealment would satisfy the first two elements of the Pelsters' fraud claim against Wayne Morton—a representation and its falsity—because the law considers the fraudulent concealment of a fact to be an implicit representation of the fact's non-existence. *Walsh v. Ingersoll–Rand Co.,* 656 F.2d 367, 369 (8th Cir.1981) (quoting

*McMahon v. Meredith Corp.,* 595 F.2d 433, 438 (8th Cir.1979)). We believe that the Pelsters introduced sufficient evidence to also support a jury finding against Wayne Morton on this theory.

■ Wayne Morton opposes the application of a fraudulent concealment theory to this case on two grounds. First, he argues that the Pelsters pled only a positive misrepresentation, which would not support an instruction or a jury finding of fraudulent concealment. *See Thorwegan v. King,* 111 U.S. 549, 555, 4 S.Ct. 529, 532–33, 28 L.Ed. 514 (1884); *Meriwether v. Lumbard,* 246 S.W.2d 363, 368 (Mo.Ct.App.1952). Without disputing this statement of the law, we disagree that the Pelsters did not adequately plead fraudulent concealment in this case.

The Rules of Civil Procedure remind us that "[a]ll pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f). With that in mind, we find sufficient allegations in the Pelsters' complaint to put the Mortons on notice that they would be required to defend against a charge of fraudulent concealment. In their fraud count, the Pelsters describe in detail transaction in which the Ciera passed through South Central, alerting the Mortons against exactly what charges they must defend. The Pelsters allege that the Mortons knew that U.S. Wholesales was selling rolled-back vehicles at the auction, but they "nevertheless allowed U.S. Wholesales to sell cars at their auction." The Pelsters also allege that the Mortons "failed to disclose their alleged agency for U.S. Wholesales."

■ Second, Wayne Morton argues that, as a matter of Missouri law, the doctrine of fraudulent concealment is inapplicable to an auctioneer sued by a purchaser who is down the chain of title because the auctioneer has no duty to speak to either an immediate or subsequent purchaser. We note that this appears to be a question of first impression in Missouri. Thus, we must apply the rule that we believe the Missouri Supreme Court would follow. *Faries v. Atlas Truck Body Mfg. Co.,* 797 F.2d 619, 621 (8th Cir.1986) (citing *Garoogian v.*

*Medlock,* 592 F.2d 997, 1000 (8th Cir.1979)). We believe that the Missouri Supreme Court would allow a subsequent purchaser's fraudulent concealment claim against a wholesale auto auctioneer who knew that an auto wholesaler was selling rolled-back cars through its auction and failed to disclose that fact.

■ Under Missouri law, the failure to disclose a material fact is considered to be an implicit representation of the nonexistence of that fact, but only if the alleged fraud-feasor has a duty to speak. *McMahon v. Meredith Corp.,* 595 F.2d at 438. Missouri courts have imposed a duty to speak under any of three conditions: (1) where there is a fiduciary or confidential relationship between the parties; (2) where there is an inequality of condition between the parties; or (3) where one party has superior knowledge not within the fair and reasonable reach of the other party. *Id.* at 439.

In this case, the parties dispute only the applicability of the superior knowledge basis for imposing a duty to speak. The Pelsters argue that Wayne Morton was, at the very least, aware that U.S. Wholesales was selling rolled-back cars to dealers who he knew would sell the cars to consumers. They assert, therefore, that Wayne Morton was in a far better position than they to end U.S. Wholesales's fraudulent activity by disclosing his knowledge to the dealer/buyers.

■ Wayne Morton counters that only Dixon Motors (not the Pelsters) may properly assert a claim for fraudulent concealment against him because only Dixon Motors was a party to the transaction that involved South Central and any possible concealment. Moreover, he argues that even if we allow the Pelsters to stand in Dixon Motors's shoes in order to assert a fraudulent concealment claim, we should compare his knowledge to Dixon Motors's, not to that of the Pelsters. If we were to do so, he asserts that we would necessarily conclude that he knew no more about U.S. Wholesales's operation than Dixon Motors knew or could have known.

Given the nature of the wholesale auto auction business and the growing problem of odometer fraud, we believe that the Missouri Supreme Court would allow the Pelsters to assert a fraudulent concealment claim in their own right. Thus, the Pelsters need not state their claim derivatively through either Modern Auto or Dixon Motors.

■ The theoretical basis underlying the law of auctions is that an auctioneer is the agent of the vendor. *Hruska v. Gehling Auction Co.,* 404 N.W.2d 322, 325 (Minn. Ct.App.1987). From that premise, courts have generally held that an auctioneer is not liable to a buyer for breach of warranty or for misrepresentation if the auctioneer has disclosed to the buyer that the auctioneer is selling on behalf of another and not on his own account. 7 Am.Jur.2d § 66 (1980); *see also Hruska,* 404 N.W.2d at 325; *Abercrombie v. Nashville Auto Auction,* 541 So.2d 516, 518 (Ala.1989). An auctioneer, however, may be liable for fraud if the buyer is able to prove that the auctioneer made a misrepresentation of his own. *See* 7 Am.Jur.2d § 66; *Hruska,* 404 N.W.2d at 325; *Abercrombie,* 541 So.2d at 518.

■ In accordance with the above-stated principles, we do not dispute that an auctioneer is not the warrantor of the vendor's representations absent some affirmative assumption of that duty. Nevertheless, the need to insulate auctioneers from the fraudulent activities of their vendors must be tempered by the law's mandate that persons with superior knowledge not within the fair and reasonable reach of others must disclose material facts. *See McMahon,* 595 F.2d at 439. Auctioneers make their commissions from the sales that occur at their auctions. They should not be able to reap profits by aiding vendors in committing fraud. Roll-back artists would not be able to complete their fraudulent schemes without a marketplace in which to unload their altered vehicles on the unsuspecting public. When wholesale auto auctions knowingly provide that marketplace and aid the reintroduction of rolled-back cars into the stream of commerce, it is

reasonable to hold them accountable. The Missouri Court of Appeals has accepted the general rule that "one who accepts the fruits of fraud with knowledge of the misrepresentations or concealment by which they were obtained will be held liable therefor, even though he did not personally participate in the fraud." *Walters v. Maloney*, 758 S.W.2d 489, 500 (Mo.Ct.App.1988) (citing 37 C.J.S. *Fraud* § 61 at 349). Thus, we hold that where an auctioneer actually knows that the vendor is committing fraud upon the buyers at the auction and does not disclose the fraud, the auctioneer will be held to answer to the buyer to the same degree as the vendor.

■ This rule comports with the liability of auto auctioneers under the federal odometer statutes. In *Tusa v. Omaha Auto Auction Inc.*, 712 F.2d 1248 (8th Cir. 1983), we addressed the issue of who is a "transferor" for purposes of the Motor Vehicle Information and Cost Savings Act. 15 U.S.C. § 1981 et seq. Although we stated that an auto auction that acts solely as the vendor's agent would not be liable as a transferor under the statute, we held that where the auctioneer had involved itself in the fraud by briefly taking title to the rolled-back vehicle, the auctioneer was liable for violating the statute. *Id.* at 1253. Similarly, we believe that where an auctioneer involves itself in the fraud by knowing of the odometer tampering and nonetheless aiding in the sale of the vehicle, the auctioneer should be held liable under the common law of fraud.

■ Adopting this rule does not transform an auctioneer into the guarantor of the vendor, nor should the rule chill the business of legitimate auctions. We are not imposing a negligence standard of due care and investigation. An auctioneer subjects himself to liability only where he actually knows that the vendor is committing fraud and continues to profit thereby at the expense of the buyer. Moreover, such a rule comports with the general principle that a person has a duty to disclose when the person enjoys superior knowledge not within the fair and reasonable reach of the

defrauded party. *See McMahon*, 595 F.2d at 439.

■ We also believe that the Missouri Supreme Court would allow a subsequent purchaser to state a fraudulent concealment claim against a wholesale auto auction even though the purchaser was not a party to the transaction in which the concealment occurred. Missouri courts have held that the turning back of an odometer is a continuing representation of its own without any accompanying written or oral statements. *Williams v. Miller Pontiac Co.*, 409 S.W.2d 275, 278 (Mo.Ct.App.1966); *Jones v. West Side Buick Auto Co.*, 93 S.W.2d 1083, 1086 (Mo.Ct.App.1936). From this rule, we conclude that the nondisclosure of a false odometer reading likewise constitutes a continuing implicit representation for as long as the odometer shows an incorrect reading.

In *Freeman v. Myers*, an affirmative misrepresentation case, the Missouri Court of Appeals allowed a subsequent consumer purchaser to assert a claim against the individual who had rolled back the odometer even though the consumer had purchased the vehicle from an intermediate dealer. 774 S.W.2d 892, 893–94 (Mo.Ct. App.1989). The defendant argued that any misrepresentation had been made only to the intermediate dealer and not to any subsequent purchaser. In rejecting the argument, the court cited Restatement (Second) of Torts § 533, which states that the maker of a fraudulent misrepresentation is liable to an individual when the maker "has reason to expect that [the misrepresentation's] terms will be repeated or its substance communicated to the other." *Freeman*, 774 S.W.2d at 894 (quoting Restatement (Second) of Torts § 533 (1977)). Likewise, if Wayne Morton knew that U.S. Wholesales was selling rolled-back cars through his auction, he had reason to expect that the odometer's incorrect reading would be communicated to a subsequent purchaser.

To survive a motion for a directed verdict under this standard, a plaintiff must introduce sufficient evidence from which a jury may reasonably infer the auctioneer's actual knowledge of the fraud and the plain-

tiff's inability to gain such knowledge. Proving facts that would make an ordinary person suspicious is insufficient to prove the defendant's knowledge. We acknowledge, however, that absent an admission by a defendant, a plaintiff will be forced to rely on circumstantial evidence to show the defendant's knowledge.

Having scrutinized the record, we find that the Pelsters introduced sufficient evidence to support a fraudulent concealment claim against Wayne Morton based on his superior knowledge. They presented evidence that a substantial number of cars with rolled-back odometers passed through their auction. Wayne Morton admitted that his duties included "overseeing the office." Given the overwhelming pervasiveness of the improper office practices of filling out titles and odometer statements, practices seemingly designed to hide altered odometers, the jury would be entitled to find that Wayne Morton knew that U.S. Wholesales was selling rolled-back cars through South Central. The jury could also reasonably make the next logical inference that Wayne Morton knew that the Ciera had been rolled back.

■ Having concluded that the Mortons, as wholesale auctioneers, had a duty not to affirmatively misrepresent or knowingly conceal a vehicle's true mileage, the question still remains whether the Pelsters sufficiently showed that any alleged fraudulent conduct by the Mortons proximately caused their damages. It is true that allowing a purchaser two or three links down the chain of title to sue a wholesale auto auction means that there will be intervening owners of the vehicle who may have known of the fraud and may have had a better opportunity than the wholesale auctioneer to disclose the misrepresentation. In this case, the Mortons argue that either Dixon Motors or Modern Auto could have disclosed the roll-back and ended the Ciera's fraudulent journey through the channels of commerce. They conclude that the conduct of the intermediate dealers insulates their conduct from liability. They emphasize that Mel Dixon was the one who told Wayne Morton that two other U.S. Wholesales cars had been rolled back.

■ To satisfy the element of causation, a plaintiff need not prove that the defendant's conduct was the only cause, the necessary cause, or even the most important cause of the plaintiff's damages. *See Todd v. Watson*, 501 S.W.2d 48, 52 (Mo.1973). The law requires that a plaintiff show only that the defendant's conduct constituted a substantial factor in producing the plaintiff's injury. *Id.; see also Ricketts v. Kansas City Stock Yards Co. of Maine*, 484 S.W.2d 216, 221–22 (Mo. banc 1972) (citing Restatement (Second) of Torts § 431).

In this case, the Pelsters testified that they had relied on the odometer itself and the odometer statement from Modern Auto in deciding to purchase the Ciera. They stated that they likely would not have purchased the Ciera and certainly would not have paid the price they did if they had known the Ciera's true mileage. The jury was entitled to infer that any misrepresentation or concealment by the Mortons helped to ensure that the odometer continued to register a false reading and that Dixon Motors and Modern Auto continued to certify the odometer's accuracy based on the certification received by Dixon Motors at the auction, all to the ultimate injury of the Pelsters. *See Freeman v. Myers*, 774 S.W.2d at 893–94.

If the Mortons believed that either Dixon Motors or Modern Auto had taken some intervening action that cut off their liability, the Mortons bore the responsibility to present evidence to that effect, which they failed to do. Moreover, mere proof that Mel Dixon knew that U.S. Wholesales was rolling back cars would not excuse any misrepresentation or concealment on the Mortons' part; such evidence may expose Dixon Motors to liability, but it would not constitute a superseding cause of the Pelsters' damages absent proof that Dixon Motors took some action that changed the nature or extent of the fraud to such a degree that it was unforeseeable to the Mortons. *O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64, 68 (Mo. banc 1989) (noting that

the "hoary doctrine" of intervening cause is "not so strong as it seems to have been at one time" and that, in civil cases, the question of foreseeability is almost always for the jury).

We conclude that the Pelsters introduced sufficient evidence to create a jury question on all elements of their fraud claim, including the presence of a misrepresentation by the Mortons and its proximate causation of the Pelsters' damages. The magistrate judge, therefore, properly denied the Mortons' motions for a directed verdict.

### III.

■■ We now turn to the admissibility of Tom Ley's testimony. "The decision whether to admit evidence is within the broad discretion of the district court and will not be overturned absent a clear abuse of discretion." *Anderson v. United States,* 788 F.2d 517, 520 (8th Cir.1986); *United States v. Henneberry,* 719 F.2d 941, 948 (8th Cir.1983), *cert. denied,* 465 U.S. 1107, 104 S.Ct. 1612, 80 L.Ed.2d 141 (1984).

The Mortons challenge the admission of Ley's testimony on several grounds. They assert that his testimony violated the rule against hearsay because he based his testimony on out-of-court statements made in oral conversations and written documents; concerned matters on which Ley lacked personal knowledge; and, to the extent it was based on the contents of documents, violated the best evidence rule.

Ley admitted in his testimony that he had obtained his information (oral and written) from numerous out-of-court sources, including previous owners, dealers, auctions, state agencies, a "confidential informant," and various individuals connected with U.S. Wholesales. During most of his testimony, it was unclear upon which of those sources of information Ley was basing his testimony. Presumably, Ley's ultimate conclusions that 300 of 350 cars auctioned at South Central had been rolled back and that U.S. Wholesales had been responsible for 204 of those 300 rolled-back cars were based on all of the sources he identified.

We find that Ley's testimony constituted inadmissible hearsay. The out-of-court documents and declarants "stated" that a particular vehicle's odometer registered a specific number of miles on a given date. Another document or declarant told Ley that the same vehicle's odometer registered a smaller number of miles on a later date. From those two out-of-court statements, Ley testified that the odometer had been rolled back in the intervening period of time. Neither the Mortons nor the jury, however, had an opportunity to examine those out-of-court statements. Moreover, Ley did not testify individually regarding all of the cars that he had investigated; he merely stated his general conclusion that people or documents had told him the mileage figures 350 times and that 300 times they had led him to conclude that a vehicle's odometer had been rolled back before the car passed through South Central.

The Pelsters claim that they did not offer Ley's testimony to prove that 300 rolled-back cars passed through South Central, 204 of which came from U.S. Wholesales. They assert that they offered Ley's testimony to show the Mortons' knowledge, intent, and common plan. They fail to acknowledge, however, that in order to prove that the Mortons knew that U.S. Wholesales was selling rolled-back cars through South Central or that they intended to defraud subsequent purchasers through a common plan, the Pelsters must first show that U.S. Wholesales was, in fact, selling rolled-back cars through South Central. To make that intermediate showing, they must initially prove that, at some point before the cars passed through South Central, the mileage readings on the cars' odometers had decreased by comparing the readings on two dates. If the Pelsters did not offer the out-of-court statements upon which Ley relied to prove the truth of those mileage figures, then the Pelsters cannot prove the first proposition in their evidentiary chain (that an initial mileage reading was higher than a subsequent reading). Consequently, they could never support an inference to prove the final proposition, that the Mortons knew of the fraud.

Of greater moment is the Pelsters' second justification for the admission of the hearsay in Ley's testimony. The Pelsters claim that Ley was an expert witness, who may base his opinions upon facts or data "of a type reasonably relied upon by experts in the particular field in forming inferences or opinions." Fed.R.Evid. 703. They repeatedly assert that Ley conducted a two-year investigation according to his standard investigative procedures, which "establishes Ley's reasonabl[e] reliance on the results of that procedure."

A district court's ruling on the admissibility of expert testimony is reviewed under an abuse of discretion standard. *Williams v. Pro-tech, Inc.*, 908 F.2d 345, 348 (8th Cir.1990); *Bartak v. Bell–Galyardt & Wells, Inc.*, 629 F.2d 523, 530 (8th Cir.1980). In this case, however, the Pelsters never qualified Ley as an expert, and the magistrate judge never ruled that he was. They never identified a field of expertise or demonstrated that experts in that field reasonably rely on the sources of information actually used by Ley. We have no ruling by the magistrate judge to review, so we cannot know whether the magistrate judge considered the testimony admissible under the theory that Ley was an expert or on some other grounds, such as the non-hearsay theory discussed above. The magistrate judge merely overruled defense counsel's hearsay objections without comment.

Nevertheless, we find that Ley's conclusions were inadmissible, even if he had been properly qualified as an expert. The Federal Rules of Evidence provide for the admission of expert testimony where it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Conversely, "[w]here the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous." *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984) (citing *Bartak v. Bell–Galyardt & Wells, Inc.*, 629 F.2d at 530). The test for determining the appropriateness of expert testimony is "the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed.R.Evid. 702 advisory committee's note.

In this case, any lay person has the ability to compare the odometer readings on two titles, odometer statements, or check-in sheets and decide whether and when the vehicle's odometer had been rolled back. *Cf. Zimmer v. Miller Trucking Co.*, 743 F.2d 601, 604 (8th Cir.1984) (proper to exclude "expert" testimony of police officer regarding whether a roadside "emergency" existed because jurors are as capable as officers of answering that question). Thus, Ley's testimony that the odometers on 204 U.S. Wholesales cars and 96 other vehicles had been rolled back before those cars passed through South Central was not necessary to aid the jury. Instead, Ley's testimony provided the Pelsters with a shortcut to a proposition further up their evidentiary chain. Moreover, it was a shortcut that was based on evidence in Ley's investigative file that may or may not have been admissible on its own and that the Mortons had no opportunity to examine or rebut.

Ley's testimony presents an especially dangerous use of expert testimony. Ordinarily, an expert sets forth the general principles or procedures relied on by experts in the field or in a school of thought within the field. The expert then draws inferences and reaches conclusions that the jury would find difficult to do on its own. The expert does so, however, on the facts of the case as they have been proven by other witnesses or by the expert's own personal investigation, which may include the taking of third party statements if of a type reasonably relied upon by experts in the field. Here, Ley relied solely on hearsay statements to prove the truth of the statements themselves, not as a basis for a conclusion that the jury was not competent to draw.

The added factor of Ley's position as a "criminal investigator" for the state further increased the danger inherent in his

testimony. His testimony is analogous to a police detective testifying that several witnesses had said that a drug dealer was wearing a blue jacket at the time he sold drugs to prove that the dealer had been so attired and that the defendant, who was arrested with a blue jacket, was guilty of distributing illegal drugs.

Having determined that Ley's conclusions were based on hearsay and were not proper subjects of expert testimony, we find that Ley's testimony regarding the results of his investigation prejudiced the defendants. It was only on the basis of Ley's inadmissible testimony that the Pelsters were able to assert in their closing argument that the chances were 86% that any car sold at South Central had been rolled back and 100% that a U.S. Wholesales car sold at South Central had been rolled back. Consequently, we must remand the case for a new trial.

On retrial, it seems likely that the Pelsters will once again call Ley to the stand. We do not hold that the entirety of Ley's testimony is inadmissible, nor do we conclude that Ley may not testify as an expert witness on some topics, if the Pelsters properly qualify him. The trial judge may well find that the jury needs the assistance of expert testimony on various issues, including what information is contained on titles, odometer statements, and check-in sheets; how titles are altered; how wholesale auto auctions operate; or any number of other subjects. What the Pelsters may not do is bring inadmissible hearsay and documents before the jury in the guise of expert testimony to prove subsidiary facts in their evidentiary chain that the jury is entitled to decide for itself by examining evidence that meets the requirements for admissibility.

We acknowledge that the Pelsters are now faced with a formidable and tedious task on retrial. In addition to presenting evidence to show the presence of a representation, their reliance, and causation, they must produce admissible documents or testimony on enough rolled-back vehicles to persuade the jury that the Mortons knew of the falsity of the Ciera's odometer reading. How many vehicles they will need to trace for the jury and how to present such evidence are questions of their trial strategy.

IV.

Because the Mortons' challenge to Ley's testimony merits a new trial, we need not reach their other claims of error. The judgment is reversed, and the case is remanded to the district court for a new trial.

BRIGHT, Senior Circuit Judge, concurring separately.

I concur in the result granting a new trial and in parts I and III of the opinion.